Hoffman, J.
"This statement is sufficiently accurate to raise the material questions in the case.
*412 “ First. Have Hitchcock and Reading a right to be subrogated to the claim of Mosquera & Co. ?
‘‘Next. Have they a right, beyond or independently of that claim, for their own advances to Mosquera & Co. ?
“ The admitted price of the ceroons is now about $32 each, which would yield, say $50,000. If Mosquera & Co. establish their whole account, the proceeds will do no more than pay it. If it is reduced, as claimed, to about $24,000, then, even if Hitchcock and Reading can be substituted for this amount, they must rest upon different grounds to support their claim for the difference, say $26,000. ($50,000 — $24,000 = $26,000.)
“ Without adverting to cases at length, as to the rule of the Common Law, it is sufficient to cite that of Navulshaw v. Brownrigg, (1 Simons 573, S. C. 7 Eng. L. and Eq., Rep. 106, and 13 Id. 261, upon appeal.) The case was first before Lord Cramworth, as Vice-Chancellor of England, and then before the Lord Chancellor. The latter thus stated the rule of the Common Law:— The common law was, upon this subject, very strict; for not only could not the factor pledge the goods, however necessary it might be to raise money for the purposes of the principal, so as to give the pledgee the right to retain the produce of them if he sold them, but not even to pay bills drawn upon the original agent, and paid by the pledgee to the credit of the original holder; so that, in point of fact, by the Common Law, there could be no dealing by way of pledge in this country with goods which had been remitted to an agent without an express authority to pledge. To meet that inconvenience, several Acts of Parliament were successively passed. The first of them was the Act of 4 Greo. 4, c. 83. That statute merely gave to the person who took the pledge the right of the person who pledged; so that if the agent had a right as against his principal, that right was communicated to the pledgee and nothing further.’" He then states the provisions of 6 Greo. 4, c. 94, and observes:—
‘ That statute enabled the agent, as regarded third persons, to sell or to pledge, provided the persons with whom he pledged did not know that he was not the actual and Bona fide owner of the property. Although you are dealing with an agent, if you do not know that he has not authority to sell, you are perfectly safe in buying the goods.’
‘ As the law, therefore, stands, any one may safely buy of an *413 agent, if he does not know (and it is absolutely necessary that he should not,) that the agent is not authorized to sell; and if the person selling is known to be an agent, then the law gives to persons accepting goods in pledge from, known agents the interest of the person who makes the pledge.’
“ The Lord Chancellor then proceeds to state the provisions of the Statute 5th and 6th Victoria, and to show in what points it extended the operation of the previous statute. The case itself is a striking illustration of the change. The owner resided in India, consigned goods to a merchant in Liverpool, with instructions to sell, and drew upon him a bill, which was accepted. The consignee placed the goods in the hands of his factor, in London, . with notice of their having been consigned to him for sale, and this factor accepted a bill of the consignee, which he paid. The consignee failed, leaving his acceptance unpaid; yet, the right of the London factor was sustained against the owner.
“ The cases of Taylor, v. Trueman, (1 Moody and Malkin, Rep. 453,) of Thompson v. Farmer, (ibid, 48,) of Fletcher v. Heath, (7 Barn, and Cres. Rep. 517,) of Blandy v. Allen, (3 Carr, and Payne, Rep. 447,) and Jackson v. Clark, (1 Young and Jervis, Rep. 216.) afford expositions of the English statutes prior to that of Victoria, and show the English law upon the present question. They appear to settle the following points:—
“ That, to enable the pledgee of a factor, who has a lien, to retain goods or documents up to the extent of the factor’s lien, the transfer must have been expressly as a pledge; that when the question is as to a sale by the factor, to the other party, the fact of actual knowledge, that the vendor was not the owner, was to be inquired into; knowledge of such fact was unimportant, so far as a right of substitution merely was claimed. The pledgee of a factor for an antecedent debt is liable, in trover, to the owner; but in estimating the damages, when the goods had been sold, he was entitled to a credit for the amount due by the owner to the factor. The right of the pledgee, whether with or without notice, depended upon the state of the accounts generally between the owner and the factor.
“ The rule in our own State, prior to the statute, appears to have been the same, viz.: that the right of pledging for advances was » prohibited, either to vest the pledgee with a title to the extent of *414 the factor’s lien, or beyond it. The lien was not transferable. Change of possession worked its loss, and the party could not hold, in his own right, the transfer as against the owner being wrongful. (Paley on Agency, 229,230, Am. ed.; Story on Agency, §§ 366-372, p. 408 ; Kent’s Com. vol. ii. p. 625, 3d ed.) ‘ The principal is not even obliged to tender to the pawnee the balance due from the principal to the factor: for the lien which the factor might have had, for such balance, is personal, and cannot be transferred by his tortious act, in pledging the goods for his own debt.’ (Cross on Lien, Law Library.)
“ There was (not properly an exception to this rule but) another rule, which prevented the transfer to a depository of goods or documents, by the factor, from affecting his own lien. Such was the case of McCombie v. Davies, (7 East., Rep. 5,) and of Urquhart v. McIver, (4 John. Rep. 103.) The latter case was especially one of a mere transfer to an assignee, who made, no advances, upon the express trust to restore the ship upon payment of the factor’s advances. Chief-Justice Kent, in delivering the opinion of the Court, (Spencer and Yates dissenting,) said: ‘A factor may deliver possession of the goods, on which he has a lien, to a third person, with notice of the lien, and with a declaration, that the transfer to such person is as agent of the factor, and for his benefit. This is a continuance, in effect, of the factor’s possession.’
“In such cases, then, there is not a transfer of the lien to a pledgee available to him, but a transfer of the factor’s possession, simply to retain the lien to himself. If the factor had been paid, the pledgee could not have set up his own advance, even to the amount existing at the date of the pledge.
“When, then, Mr. Justice Story, in section 367, (on agency,) says, that an agent having a lien, may lawfully transfer and pledge the same to another person, as a security, to the extent of the amount due himself; and when Chanceller Kent (2 Com. 639) states the rule similarly, the position is. either to be understood to be the law, as influenced by the statute, or appears to require some modification.
“ It may be, that when all the parties are before the Court, in an equity suit, and an admitted or proven balance is due the factor, by whom- goods have been pledged, the pledgee may avail him *415 self of the factor’s right, and the relative claims be thus adjusted.
“ Is our statute, then, sufficient to support the rule found in the English Acts and cases prior to that of Victoria ?
“ It was passed in 1830. (2 R. S. 3d ed. p. 59.) It is declared in several cases, to have been framed upon the Acts of George IV. (Covill v. Hill, 4 Denio Rep. 329; 2 Seld. 374; Stevens v. Wilson,6 Hill Rep. 512.)
“And, first, will it bear the construction of allowing a pledgee, with notice of the agency, to be subrogated to the lien of the factor ?
“ In Stevens v. Wilson, when in the Court of Errors, (3 Denio Rep. 473,) the Chancellor said:— Our statute does not, as in the 5th section of the 6th Geo. IV. ch. 94, authorize the agent or factor to pledge the goods of his principal to the extent of his lien, to persons who .are aware of his fiduciary character, and without any authority from his principal for that purpose.’
“In the Supreme Court, (6 Hill Rep. 512,) Bronson, Justice, observes :—‘ Whether the factor, without any special delegation of authority for that purpose, may pledge the goods to raise money for the benefit of his principal, or whether he may pledge the property to the extent of any lien he may have upon it, are questions which do not arise upon this Bill of Exceptions. Colgate had no lien upon the goods. He was a debtor to the plaintiffs, and he made the advances to the factor, with the knowledge that the plaintiffs were the owners of the property.’
“ The case was first tried in this Court, and went to the Supreme Court, on writ of.error. Upon the trial, (in 1841,) it appears that the Judge did embrace in his charge, the proposition, that the pledgee could retain against the owner, for the factor’s lien, for he told the jury that the statute did not enable him, having knowledge, to retain the goods against the principal, for any advances to the factor, to any amount beyond the right or interest of the factor therein. (See the charge stated at length in the dissenting opinion of Johnson, Senator.) The Chancellor, also, (p. 476,) states this as the result of the charge.
“ The case decided, that a party making advances to a consignee, with full knowledge of the fact as to his agency, was not protected by the Act. But the factor himself had no lien.
*416 “ The first section, thus interpreted, amounts to this—that when the agency is known, no sale or disposition for money advanced, or negotiable paper given to the agent, will be available.
“ The second section of the English Act, and the third of our own, correspond on the subject matter. They differ in this important particular. By the former, the possession of the documents specified will give validity to a contract with another, for the sale or disposition of the goods, or the deposit or pledge thereof, if the buyer, transferee or pledgee has not notice that the party is not the actual and Bona fide owner. By the third section of our Act, the words are limited to a sale and disposition, the words deposit or pledge being omitted. Hence, as the case of Stevens v. Wilson decides, this section is to be read as if the words, as to notice, in the English Act, were employed; and then we have the case covered of a sale and disposition to one without notice. Yet, it may be well urged, that a pledge to one without notice, is covered by the phrase disposition.
“ But the third section of the English Act differs from the fourth corresponding section of our own, in a marked particular. The person who takes goods in pledge for an antecedent debt, without notice of the ownership, acquires the right of the party making the pledge, and no other. The clause, without notice, is omitted in our section. The English fifth section gives the pawnee the right of the factor, even when he has notice, for advances then made on the security. Ho such section is found in our Act. But the omission of the clause, without notice, in the fourth section, may perhaps justify the argument, that the pledgee, even with notice, for a prior demand, may be substituted in the place of the factor. If so, it would be strange that he should not be substituted for advances, at the time, to a like extent.
“ The fifth section of our statute, which corresponds with the sixth’ section of the English Act, is consistent, at least, with this supposition.
“Second.—Leaving this point of the case as not clearly settled, I proceed to the second inquiry, viz.:—whether the defendants Hitchcock & Reading are not entitled to hold the goods on the basis of their own advances, irrespective of the lien of Mosquera & Co.
“ The Act contemplates and provides for two cases: one of actual *417 possession of goods—the other of the symbolical title to them by possession of documents.
“ The case which-is made by the defendants, is of the possession of permits of landing, and warehouse-keeper’s receipts, and what is termed in the answer, a letter of consignment. Some of the bark was, at the date of the first advance, in store, and it is averred that this was transferred to Hitchcock & Reading.
“ The statute enumerates, among the documents of title, bills of lading, custom-house permits, or warehouse-keeper’s receipts for the delivery of merchandise. The defendants say that they had a transfer of permits, and storehouse receipts. This seems to me sufficient to constitute a title. The answer is also explicit, as to the defendants’ ignorance of the plaintiffs being the owners, and of their belief that Mosquera & Co. were such owners.
“But the case of Blose v. Holmes, (2 Moody and Robinson Rep. 22) is referred to by the plaintiffs’ counsel, as proving that the possession of the permits and the warehouse receipts, is not sufficient.
That case was an action of trover. The plaintiffs contended that the Act only gave validity to pledges made by a factor of bills of lading, and other documents of that nature evidencing title, and with which the factor may have been intrusted by his principals; all the documents enumerated in the statute were of that description; but here the banking company made the advances on the faith of a mere delivery order in the one case, and of the warehouse-man’s acknowledgment in the other; neither of them being instruments with which his principals had intrusted him; but both of them instruments created by the factor himself, for the very purpose of raising money.
“ Alderson, Baron left it to the jury to say, whether the banking company, at the time they made the advances, were aware of the fact, that the goods did not belong to Hollingworth, and whether Hollingworth himself had any lien on the argol, which he could transfer to the' defendant, under the fifth section of the statute. With regard to the other point, his lordship expressed a clear opinion that the statute gave validity only to pledges by a factor of documents with which the real owner had previously intrusted him; and that it did not extend to the pledge of documents created, (as in the present instance,) by the factor himself. *418 He thought it right that the question of fact should be left to the jury; but in the event of their finding that the banking company made the advance in ignorance, that the goods were not the property of Hollingworth, he should still direct the verdict to be entered for the plaintiffs.
F. B. (Jutting, for plaintiffs and appellants, contended :—
That, at Common Law, Mosquera & Co. had no power to pledge, and by such an act would forfeit the lien they otherwise would have had for the advances made by themselves to the plaintiffs.
That Hitchcock & Reading had not, under any provisions of the N. Y. Factors’ Act, acquired any lien upon the bark, or any right to retain it, as against the plaintiffs, the true and actual owners.
That they had not made their alleged advances, upon the faith of Mosquera & Co. being the owners, induced by any of the docu *419 mentary evidence of title, specified in the Act, intrusted to them by the plaintiffs, and by Mosquera & Oo. deposited with Hitchcock & Reading.
*418 “ The jury found that the banking company knew that the goods were not the property of Hollingworth, and that Hollingworth had no lien on the argol, and there was consequently a verdict for the plaintiffs.
“ I confess I am not able to see the propriety of this decision, at least as applicable to our course of proceeding under foreign consignments and the custom-house regulations.
“ The invoices which accompany a shipment, are deposited, and the bill of lading is exhibited, at the custom-house. The possession of the bill of lading enables a consignee to obtain the permit. (Laws U. S., 1799, §§ 23, 24.) The latter becomes the document of title, and the factor is as fully intrusted with this, by the owner, as he is with the bill of lading itself, for the owner enables him to obtain it.
“ In my opinion, the defendants, Hitchcock & Reading, appear, upon the case as presented, entitled to the bark.
“ The order will be, that the motion be denied, and the interim injunction be discharged, upon those defendants entering into an undertaking to keep an account of the sales and disposition of the bark, and to pay over the same to the plaintiffs, or such part thereof, as it may be adjudged they are entitled to.”
*419 That the “letter of consignment,” the “custom-house permits,” and “ warehouse-keeper’s receipts,” spoken of in their answer, were not, and that neither of them was such a document as the Factors’ Act makes evidence of ownership, or as will protect a pledgee, or person advancing on the faith of ownership induced thereby, and on the deposit thereof, and that the plaintiffs had not, within the meaning of that Act, intrusted Mosquera & Co. with either of such documents.
That the document must be one which the Act specifies, and that the plaintiff must himself have intrusted his agent with such document, to satisfy the statute.
That Mosquera & Co. had not actual possession of the bark, at the time of the alleged advances: it was then in the legal and actual custody of the Collector of the Port of New York, subject to duties thereon. They could not, as agents, not having the documentary evidence of title to the bark, but intrusted with the possession of the bark for the purpose of sale, make a valid pledge of it. And it was essential to the validity of such a pledge, that the pledgee should, at the time, take actual possession of the goods claimed to be pledged, and this Hitchcock & Reading had not done.
He discussed the cases cited on the written points submitted, on the part of the respondents, Hitchcock & Reading, (which will be found infra,) and most of those cited in the opinion of the Court. A reference to them here, as being unnecessary, is omitted.
Geo. N. Titus and Charles O' Conor, for the respondents, Hitchcock & Reading, submitted and argued the following points, viz.:
I. It is a general and fundamental principle of the Common Law, that title to personal property cannot be divested except by the consent of the owner. (Saltus v. Everett, 20 Wend. 275.)
II. Certain personal things, by the custom of merchants, which is part of the Common Law, have been endowed with negotiability ; so that the bona fide receiver, for value, in the ordinary course of trade, acquires a good title. Things which may be *420 denominated the currency of trade, are about all that come within this established exception to the general rule. After a great struggle, the well-known muniment representing the ownership, called the bill of lading, was brought within this principle; so that a transfer by the consignee gave to a bona, fide transferee, etc;, a good title to the goods, as against the consignor. (Lickbarrow v. Mason, 1 Smith’s Leading Cases, 387; see the same point briefly stated by Yerplanck, Senator, in 20 Wend., 280, 281.)
III. Another analagous general rule of the Common Law is, ' that the power of an agent must be shown, in order to'render his act binding on his principal. It necessarily resulted from this rule, that an agent, authorized to sell goods on behalf of his principal, could not pledge them. It also resulted, that a pledge by the agent, for his own debt, was a breach of duty on his part; and, as the lien of an agent for his balance, on the goods in his hands, is a special privilege accorded to his class by the favor and indulgence of the law, as a reward for the risks incurred in the faithful performance of his duty, such lien will not be allowed to him who throws off the character of agent, and, by a petty treason toward his principal, assuming to be owner of the goods, converts them to his own personal use.
1. The first modification of the latter somewhat rigorous branch of this rule, in England, was by the first Factors’ Act of 1823. It allows (among other things) that the pledgee of an agent (even with notice) shall hold to the extent of the lien of the agent. And the more extensive Factors’ Act, passed in 1825, § 5, re-enacted this very equitable doctrine. It has been judicially doubted whether the New York Factors’ Act retains this principle. (Stevens v. Wilson, 3 Denio, 475-6.) . But we submit that notice, and no new advance, are, in judgment of law, precisely the same impediment to the acquisition of a title as bona fide purchaser; and, consequently, we claim that the fourth section of the New York Factors’ Act adopts this equitable mitigation. (Judge Hoffman's Opinion.)
2. The bill acquiesces in this equity, and assents to pay, to whichever defendant may be entitled to it, whatever sum the plaintiffs may be found to owe Mosquera & Co., as a condition of the relief sought; and, even if they were unwilling,'a Court of Equity would no doubt impose that very condition.
*421 XV. Assuming the construction just claimed, and consequently that Hitchcock & Reading are entitled, at least, to the amount due from the plaintiffs to Mosquera & Go., the case made for an injunction is very feeble.
1. The debt due to Mosquera & Co., from the plaintiffs, is very nearly equal to the whole value of the goods.
2. The claim set up to reduce this sum, by the amount of a loss which Mosquera & Go. omitted to cover by insurance, rests, both as to law and fact, upon very dubious premises; and on a careful examination of the facts, the loss would be found not to exceed $13,000 or $14,000.
V. The English Factors’ Acts are subject to very different considerations from those applicable to the Hew York Act, and the bearing of the English decisions cannot be appreciated without carefully observing these differences between the legislation of the two countries.
1. The first section of the Act of 6 Geo. IV., ch. xciv., commonly balled the Factors’ Act, (Dunlap’s Paley App., No. 1,) does not differ in the slightest degree from §§ 1 and 2 of the Hew York Factors’ Act of 1830, in point of substance. The former is an average specimen of English verbosity: the latter are framed in the more brief and simple style of American legislation, a. The point most worthy of notice about the English Act, in this immediate connection, is, that this first section is limited to the case, of goods shipped, and operates only in favor of a consignee advancing on the faith of the consignment, b. The brevity of these sections, in the Hew York Factors’ Act, gave rise to a question which could not have arisen under the full and explicit verbiage of the corresponding sections of the English Act. _ It was erroneously imagined that the mere existence of a bill of lading, no matter though obtained by a thief, would give a consignee a lien for his advances. (Covill v. Hill, 4 Denio, 329, 330 ; S. C. on appeal, 2 Seld. 380.)
2. The third section of the Hew York Act, is an adoption of the second section of the English Act, with the same studied effort to avoid redundancy in verbiage, and with but one difference in point of substance. That difference, however, Is very important. A much litigated question grew out of, and others may arise, from its meagreness of language, as compared with its prototype.
(a.) On comparing the sections, it will be observed, that the English section contains an express proviso, (not found in the Hew *422 York Act,) that it shall not operate in favor of one having notice that the agent in possession of the documentary proof of title was not “ the actual and bona fide owner.” (See 3 Denio, 482, where this is observed upon.) The point in Stevens v. Wilson, 6 Hill, 514, was, whether the pledgee of a known factor for sale, could hold as against the true owner. The Superior and Supreme Courts held in the negative: thus deciding that the omission of the proviso wrought no consequence; and that, in this respect, the second section of the 6th Geo. IV., ch. xciv., and the third section of the Hew York Factors’ Act, were identical. This case went to the Court of Errors, and was there very fully considered. Chancellor Walworth, with his usual ability and clearness, reviewed the whole subject. Six written opinions and 21 votes were given for affirmance, Senator Johnson alone dissenting. The case throughout turned upon this single point, i. e., the materiality of notice. (3 Denio, 482.)
(b.) This was just exactly such another point as that made on the shipment sections in Covill v. Hill. (See, also, 20 Wend. 272, 281, 284.)
(c.) The difference between the two sections, in point of substance, is this: The English Act did not authorize a factor for sale, to make a valid pledge on the strength of a mere possession of the goods. “ If,” saysLord Denman, delivering judgment in Hatfield v. Phillips, (9 Meeson & Welsby, 649,) “ they are received into his own (the factor’s) warehouse, neither by the Common Law, nor by the statute in question, can he pledge the goods; nor will there be any document indicative of title, which can bring him within the second section of the statute.” The English statute was confined to the case of documentary title, intrusted to the factor by the owner. It did not go the length of making possession of the goods themselves a voucher on which third persons might safely act. It was not deemed good policy in England to go so far, at least, by the Judges. They said: “ the owner cannot earmark his goods; he may easily earmark the muniments of title with which he entrusts his agent; and, if he chooses, from blind confidence or negligence, to omit that precaution, it is fair that he should bear the loss.” The second section of Geo. IY., ch. xciv., as expounded by the English Courts, merely extended to certain other documents the doctrine of Lickbarroio v. Mason, 1 Smith’s Leading Cases. 387; 43 Law Library. See its point, briefly described by *423 Verplancks, Senator, in 20 Wend. 280, 281: “He who trusts his consignee with a bill of lading in ordinary form, gives him the full power of disposition as to bona fide dealers with him.”
Hence arose the English Point, as it may be called, that where documentary evidence of title, in the factor, is relied upon, by a pledgee, to oust the prior equity of the original owner, in favor of a bona fide dealer with the factor, the document must be one, mediately or immediately, emanating from that owner. One which he might have earmarked, had he chosen to employ that precaution. (In Exch., Hatfield v. Phillips, 9 M. & W. 647; Phillips v. Huth, 6 id. 572; S. C. in House of Lords, A. D. 1845; 14 M. & W. 671; 12 Cl. & Finn. 356.)
(d.) The New York Act, § 3, took a stride far in advance of the English Act, as it was construed by the English Judges. In addition to the case provided for in the English Act, it adds: “ and every such factor, or agent, not having the documentary evidence, who shall be intrusted with the possession of any merchandise for the purpose of sale, or as security for any advances to be made or obtained thereon,” shall be deemed the true owner.
(e.) The English Judges said, with great propriety, you shall not lodge the goods with your own warehouse-man, and pledge his receipt given to you, because you are not authorized to pledge the goods themselves. But "when once authorized to pledge the goods themselves, the power to make, by his own act, the necessary documents of title is, by necessary consequence, vested in the factor, as an incident. (Jennings v. Merrill, 20 Wend. 11; per Lott, 3 Denio, 478.)
3. It was an inconveniently rigorous rule, that a factor could not, by taking up a loan, transfer the possession of his principal’s goods to the lender, together with his own just and lawful lien upon them, as against the principal, for his general balance. The Acts of Geo. IV. abrogated this rule. Ch. Walworth, in 3 Denio, 473, seems to think it was not wholly abrogated by our statute. He is probably mistaken; but if our legislators have not failed, in that one particular, they have shown much more skill in dealing with this subject than the British Parliament. A very brief review of the several statutes, and the cases, will show, that in one single short Act, our Legislature accomplished all that it took Parliament many years to effect, with their three verbose statutes. *424 (1.) The Act of 4 Geo. IY. ch. 83, was passed in 1823. (2.) The Act of 6 Geo. IY. ch. 94, was passed in 1825. It is most probable that Parliament intended, by the 4th section of the latter Act, to give the power of pledging to the agent or factor, who was intrusted with the possession. But after much litigation, as appears by the cases cited, from 6 and 9 Meeson & Welsby, the Court settled it that pledging was not an act in the usual course of business.. The latter decision was in 1842. The decision, in 9 Meeson & Welsby, immediately produced the Act of 5 and 6 Victoria ; but the party went on and contested the point to the Court of final appeal, where it was decided in the same way, affirming the Exch. Chamber. (14 M. &. W. 671; 12 Cl. & Finn. 356.) The Act of 5 and 6 Victoria, ch. 39, enacted, in substance, that pledging, and taking advances, had become a usual course of trade, and placed the English Factors’ Law, in this respect, on precisely the same footing on which it had been placed by the Legislature of New York, in 1830. (Dunlop’s Paley on Agency, app., No. 2; 9 Meeson & Welsby, Am. ed., 650. Note; Navulshaw v. Brownrigg, 7 Eng. L. & Eq. 112; S. C. on appeal, 13 Eng. L. & Eq. 262; St. Leonards Chancellor.)
VI. The inapplicability of the English doctrine, about “ intrusting” the agent with documents, to the question now before this Court, is made evident by this review. But inasmuch as it became the absolute duty of Mosquera & Co., immediately upon the arrival of the goods, to enter them, to obtain landing permits, and (paying the duties) to take the goods into their own possession, or to enter them for warehousing, and take the requisite documents, the reasoning of the English cases would make the obtaining of these documents by Mosquera & Co., an act of the plaintiffs, even within the English rule. For qui facit per alium facit per se. (9 Statutes at large of United States, p. 53.) 1. It will be seen, that Phillips v. Huth was decided by the jury as a question of fact. 2. It was shown, that by the usage and custom of trade, it was not within the factor’s duty to obtain the documents on which the pledge was made. He did it of his own motion, to answer his own ends, without the consent of his principal, against his wishes, and, in fact, by a surprise upon him. How totally unlike the present case.
VII. Turning its attention to the facts, the Court will see that *425 the plaintiffs had intrusted Mosquera & Co. with the complete control and possession of the goods, and had given them complete authority to take out custom-house permits, etc., and thus to clothe themselves with written evidence of title. It is not a case where Mosquera & Co. had merely an opportunity of wrongfully obtaining possession of a muniment of title. Again, it will be seen, that giving all possible effect to every petty criticism, as to the order of events, Hitchcock & Reading advanced their money on the faith of the apparent title of Mosquera & Co., and without any notice.
There is, consequently, no ground for an injunction.
By the Court. Duer, Ch. J.
This is a case of the first impression ; and, from the nature of the questions which it involves, and their bearing upon mercantile transactions, of great importance and frequent occurrence, it may truly be said, that the public, and not merely the parties, have an interest in its decision. We have examined those questions,—such, at least, has been our endeavor—with all the care and attention their novelty and their importance seemed to demand.
The case is before us, upon an appeal, by the plaintiffs, from an order at Special Term, denying a motion for the continuance of a temporary injunction, by which the defendants were restrained from selling, or otherwise disposing of 1539 bales—in commerce, termed ceroons—of quina, or Peruvian bark, of which the plaintiffs claim to be the owners.
It" appears from the pleadings, and is not denied, that the plaintiffs, who are merchants at Bogota, in Hew Grenada, trading under the firm of Bonito & Duque, shipped the merchandise in question at different times, and by different vessels, to the defendants, T. C. & A. Mosquera, merchants in this city, transacting business under the firm of Mosquera & Co., to be sold by them on account of the shippers; and the complaint avers, and the answers do not deny, that the whole of the 1539 ceroons, in respect to which an injunction is sought, are now in one of the bonded warehouses of this city, subject to the lien of the Government of the United States for the duties chargeable thereon.
Heither the terms of the bills of lading, by which the various shipments were consigned, nor the character and form of the entries made by Mosquera & Co., at the custom-house, appear from *426 the pleadings; and in the absence of contrary proof, we shall, for the purposes of the present appeal, intend that it did not appear on the face of the bills of lading, nor of the custom-house entries, that Mosquera & Co. were not the true and sole owners of all the bark consigned to them.
The complaint admits that Mosquera & Co., by the acceptance and payment of sundry bills of exchange, have made large advances upon the different consignments received by them, but avers, that the account which they have delivered to the plaintiffs is greatly erroneous, and insists, upon grounds fully stated in the complaint, that a deduction of more than $26,000 ought to be made from the balance which the account rendered alleged to be due.
Eor reasons that hereafter will be fully explained, it will not be necessary that we shall enter at all into the state of the accounts between Mosquera & Co. and the plaintiffs. It is sufficient, now, to say, that the mere existence between them of an unsettled and disputed account would furnish no reason for denying to the plaintiffs the injunction which they seek, if upon other grounds such an injunction ought to be granted.
The defendant, Tracy, is the general assignee of Mosquera & Co., who became insolvent before the commencement of this suit. He has answered jointly with them; but although the allegations in this joint answer are material in their bearings upon the transactions between Mosquera & Co. and the plaintiffs, the purposes of the decision we are to pronounce upon this appeal do not require them to be stated. The main facts upon which the plaintiffs found their right to an injunction—namely, that the 1539 ceroons, in respect to which the injúnction is sought, were consigned to Mosquera & Co., for sale on account of the plaintiffs, and are now in a bonded warehouse, subject to the payment of duties—are not denied, but distinctly admitted.
The remaining defendants, Hitchcock & Reading, are the members of the mercantile firm of Hitchcock & Reading, and it is the controversy which their answer raises, between them and the plaintiffs, that alone demands our attention. They allege in their answer that the 1539 ceroons in question are in their sole possession, or under their sole control; and they claim to hold, and to be entitled to hold them, as a security for advances exceeding *427 $60,000, which they aver to have made at different times to Mosquera & Co., upon the faith that they were in truth the owners of the property which they had imported and undertook to pledge. Whether, upon the facts set forth in their answer, the title of Hitchcock & Reading as pledgees, can be sustained in opposition to the rights of the plaintiffs as owners, is the question that we are required to determine.
If the determination of this question rested upon the rules of the common law, it would be wholly free from difficulty. It would be our duty, at once, to say that the defence set up cannot be maintained. By the undoubted rules of the common law, a factor, to whom goods are consigned for sale, has no authority to pledge them; and whatever advances he may have made to his principal, and even when the moneys raised by him are applied to the use of his principal, if without an express authority he pledges, as owner, the goods or the documents of title intrusted to him, he is guilty in judgment of law of a violation of his trust; and his act, as tortious and void, passes no title, and can create no lien. On the contrary, it gives to the owner an immediate right of action for the recovery of the goods, or their value, against the innocent pledgee, who was not allowed either to bar a recovery or reduce its amount by any inquiry into the state of the accounts between the plaintiff and his unfaithful agent. (1 M. & Sel. 140 ; id. 484; 3 B. & Cres. 342; 5 Term Rep. 604; 6 M. & Sel. 1; id. 14; 2 B. & Bing. 639; Park B. in Phillips v. Huth, 6 Mees. & Wels. 596; 14 Johns. 129; 20 Johns. 421; 26 Wendell, 467; Walther v. Wetmore, 1 E. D. Smith, pp. 24, 25; Opin. Woodruff, Justice.)
It was because these unbending rules of the common law, in their practical operation, were found or deemed to be oppressive and unjust, that in England the several Acts of Parliament were passed, which are particularly referred to in the opinion of our brother, by whom this case was decided at Special Term. (4 Geo. IV., c. 83 ; 6 Geo. IV., c. 94; 5 & 6 Victoria, c. 39.)
It was with the intention of extending a similar protection, to persons dealing in good faith with apparent owners, that our own Legislature, in 1830, passed the Act—commonly called the “ Factors’ Act,”—“for the amendment of the law relative to principals and factors or agents,” (Sess. Laws, 1830, c. 179, 1 R. S., 2d ed., *428 p. 762;) and it is by the provisions of this statute, reasonably interpreted, and in their just application to the facts, as set forth in the answer of the defendants, that in forming our decision we must be governed.
The allegations on the part of the defendants, Hitchcock & Reading, are, that the several contracts under which they made their advances to Mosquera & Co., although void at common law, Were rendered valid by the' provisions of the third section of the statute, and that should it otherwise be held, they are at least entitled to a lien under the fourth section to the extent of the balance due from the plaintiffs to Mosquera & Co.
In proceeding to inquire whether these allegations can be sustained, we shall give, in the first place, a full exposition of the third section of the statute, as we understand, and after much consideration must construe, its provisions; and we shall then apply our exposition of the statute to the facts of the case, as we collect them from the answers of the defendants.
We shall also incidentally state our views as to the proper construction and application of the fourth section of the statute; but whether Hitchcock & Reading, under that section, and upon the supposition that their defence cannot be sustained under the third, or upon any other grounds, may be subrogated to the rights and remedies, as against the plaintiffs, of Mosquera & Co., is .a question that, for reasons hereafter to be explained, it will not be necessary to determine. It will be seen, that it cannot now be so determined as to affect the present rights of the plaintiffs to an injunction.
First.—The important third section, not a phrase or word in which can with propriety'be omitted, reads as follows:—
“ § 3. Every factor or other agent intrusted with the possession of any bill of lading, custom-house permit, or warehouse-keeper’s receipt for the delivery of any such merchandise, and every such factor or agent, not having the documentary evidence of title, who shall be intrusted with the possession of any merchandise for the purpose of sale, or as a security for any advances to be made or obtained thereon, shall be deemed to be the true owner thereof, so far as to give validity to any contract made by such agent with any other person, for the sale' or disposition of the whole or any part of such merchandise, for any money advanced, or negotiable *429 instrument or other obligation, in writing, given by such other person upon the faith thereof.”
It is evident, upon- a slight consideration, that the words of this section, literally construed, have failed to express the full intention of the Legislature, and that, in order to carry that intention into effect, there are certain omissions which a reasonable construction must supply. If, for example, we look merely at the words of the section, it is sufficient to give validity to a contract made by an agent for the sale or other disposition of merchandise described in a bill of lading, that the bill is in his actual possession when the contract, is made, and that the person advancing money upon the contract shall believe, no matter upon what evidence, that the agent is the owner of the goods. It is not, in terms, required that the bill of lading shall have been intrusted to the agent by the owner of the goods, nor that it shall appear upon its face, that the agent is, or may be the owner, nor that it shall be transferred, or even shown to the person making the advance; and the words of the section are just as applicable to an executory contract for the delivery of the goods on a future day as to an immediate sale, deposit or pledge. It is certain, however, that the provisions of the section, if thus construed, would afford facilities and give effect to frauds which it is impossible to believe that the Legislature meant to sanction. They would enable a faithless agent not only to defraud the true owner of the goods, but, by a prior contract, to divest the title of a subsequent bona fide purchaser, although to such purchaser the documentary evidence of title may have been transferred or the possession of the goods have been actually delivered, and all this in favor of a person, who, in advancing his money or credit, trusted only to the verbal assurances of the agent, unsupported by any evidence of his title or possession. There can be no hazard in saying that a construction leading to these consequences was not, and could not have been intended, by the English Parliament or by our own Legislature.
In all the adjudged cases to which I shall hereafter refer, a literal construction of the statute—I speak of the English as well as our own—is expressly or impliedly rejected; nor has it been contended that such a construction ought now to be followed. It is not denied, that there are some restrictions which, in order to *430 carry into effect the undoubted intentions of the Legislature, must be imposed upon the generality of the terms employed. Guided, therefore, by the prior decisions, and by our own reflections, I shall proceed to explain the provisions in the third section of the Act in conformity to that which, although imperfectly expressed, we fully believe to have been the true and sole intention of the framers of the law, and of the Legislature by which it was enacted.
This important section is not merely founded on, but, with some variations, is an exact transcript of the second section in the English statute, (6 Geo. IV., c. 94.*) The variations are however material, and for several reasons require to be noted.
The English statute does not mention a custom-house permit as a document of title, and it enumerates, as such, several instruments, which, in our own Act, are omitted. The clause in our own Act beginning, “ And every such factor,” etc., and ending with the words, “ obtained thereon,” is not found in the English statute, which confines the protection, which it gives, to those who contract with the agent, “ upon the faith of the several documents, or either of them,” before enumerated.
In the 2d section of the English statute, the words, “for the sale, or disposition of any such goods wares, or merchandise, or any *431 part thereof,’’are followed by these: “ or, for the deposit or pledge thereof, or any part thereof, as a security;’’ and why these significant words were omitted in our own Act, it is not easy to understand. The omission would seem to render it questionable whether a contract of deposit or pledge, as a security for advances, was meant to be protected, so as to exempt such a transaction from the operation of the rules of the common law; but we are satisfied, upon reflection, that it was not intended that this effect should be given to the omission, and that it ought not to be construed as varying the construction of the Act, so as to deprive a depositary, or pledgee, of the benefit of its provisions. We are persuaded that, by a different construction, we should defeat what must have been, and, in all the cases, is considered as having been, the main purpose of the Act, namely, to give validity to contracts which the rules of the common law wholly prohibited. The words, “ for any money, or negotiable instrument given or advanced,” which our Act retains, have a sole reference in the English statute to a deposit or pledge of the goods, and it is only to such a contract that they seem to be properly applicable; and whatever doubts might otherwise be entertained as to their proper application, we think, are removed by the 7th section of the Act, the words of which, by a necessary implication, admit the validity of a deposit made by a factor or agent, of any merchandise or document of title intrusted to him, as a security for any money or negotiable instrument borrowed or received by him. I add, that in all the cases in our own Courts, to which I shall hereafter refer, the validity of a pledge made by a factor to a person believing him to be the owner, is admitted both by the counsel and by the Judges. The word “disposition” is certainly broad enough to embrace the contract, and we hold that it is, in its broadest sense, that it must be construed; although it cannot be denied, that in England a far more limited interpretation has been given to it. (Taylor v. Kymer, 3 B. & Ad. Rep. 320; Russell on Factors, p. 126, Law Lib. Ed. pp. 88, 89.)
There is another omission in our Act, which it is proper, briefly, to notice. The corresponding section in the English statute concludes with a proviso, that the person contracting with an agent shall not have notice by the documents of title, or otherwise, that such agent is not the owner of the merchandise which he sells or *432 pledges. In other words, that the contract shall be void, where such notice is proved. In our opinion, the omission of this is immaterial, since we hold it to be certain, that, in reality, it expresses no more than, in its absence, the law would imply; and such we consider to have been the decision of this Court in Zachrisson v. Ahman, (2 Sand. S. C. R. 68,) and of the Supreme Court, and of the Court of Errors, in Stevens v. Wilson, (6 Hill, R. 512; S. C., 3 Denio R. 472.)
There are no cases in our own reports, that, by fixing in some degree the construction of the Factors’ Act, throw any light upon the questions we are to determine, except those that I have last-cited, and that of Covill v. Hill, (4 Denio R., 327; S. C., 2 Selden R. 374;) and, before I proceed further, it will be expedient to state more particularly the import and extent of those decisions. There are, at least, one or two questions which we regard them as having definitively settled.
Stevens v. Wilson, et al., (6 Hill Rep. 512,) came before the Supreme Court upon a writ of error, upon a judgment of this Court, in favor of the plaintiffs. The action was replevin, and was brought for the recovery of a quantity of feathers, which the plaintiffs had consigned to one Colfax, a commission merchant in this city, for sale on their account. Colfax had placed the feathers in the hands of the defendant, Stevens, for the same purpose, and had received from him an advance of about $3000. But Stevens knew, when he made the advance; that the plaintiffs were the owners of the property, and Colfax merely their factor for its sale. The case turned entirely upon the construction to be given to the last words in the 3d section of the statute, “ on the faith thereof.” The contention on the part of the defendant was, that these words referred to the word “ merchandise,” as their last antecedent, and consequently that every person is protected by the statute, who makes advances to a factor upon an actual deposit or pledge of merchandise, even when he knows that the factor is not the owner, and has merely an authority to sell. But the Court rejected this construction, as highly unreasonable and tending to legalize fraud; and, in delivering its judgment, Bronson, Justice, said, that “although in' strict grammatical construction, the words on the faith thereof,’” might refer to merchandise as the last antecedent, yet, in good sense, as well as sound morals, the reference -was to the pre *433 vious words, ‘ shall be deemed to be the true owner thereof;’ and he added, that “ the obvious meaning of the statute is, that the factor or other agent, who has been intrusted with certain documentary evidence of title, or with the possession and ostensible ownership of the property, shall be deemed the true owner thereof, so far as may be necessary to protect those who have dealt with him upon the faith thereof, that is, the faith induced by the usual indicia of title, that he was the true owner of the property.” The judgment of the Supreme Court in favor of the defendants in error, the plaintiffs in the action, was subsequently affirmed in the Court of Errors; and a learned senator, who gave a lucid opinion in favor of its affirmance, adopting substantially the views of Mr. Justice Bronson, said that “ full effect and operation can be given to the law, and to the terms ‘ on the faith thereof,’ by protecting those who bona fide contract with a factor or agent, as owner, on the faith of the possession of the goods intrusted to him, or of the documentary evidence of title specified in the Act.” (Opinion, Lott, Senator, 3 Denio R. 479, 480.)
Zachrisson v. Ahman, (2 Sandf. S. C. R.,) 68, merits particular attention; for, as a deliberate judgment of this Court, we, as successors of the eminent Judges by whom it was pronounced, are certainly bound by its authority, and should so hold, even had we entertained serious doubts as to the propriety of the decision. We are not, however, to be understood as intimating that the propriety of the decision, although it is plainly inconsistent with a literal and grammatical construction of the statute, is to our minds at all doubtful.
The action was replevin for the recovery of 221 bales of cotton, and for the bills of lading issued therefor. The plaintiff was a Swedish merchant, transacting business in this city, and his title as owner was clearly established, as it was proved that the cotton had been purchased and shipped on his account, on a voyage from this port to Gothenburg, in Sweden, by one T. Wissman, who, during the absence of the plaintiff, under a mercantile procuration and power of attorney, had the general charge of his affairs. The chief agent, however, in the purchase and shipment of the cotton, was one Suber, a clerk of Wissman, but who, in a modified sense, and subject to the direction and control of Wissman, was an agent *434 of .the plaintiff in making the purchase. Súber procured the bills of lading to be filled up in the name of the defendant, and deposited them with him as a security for a loan of $6000, stating that he meant to use the moneys so borrowed for the benefit of the plaintiff, in the payment for cotton before purchased. The representation was false, and the money was fraudulently applied by Súber to his own use, and his employer, Wissman,.upon the discovery of the fraud, and before the commencement of the action, demanded the bills of lading from the defendant, who refused to deliver them up. It was insisted, on behalf of the defendant, upon the trial, and at the General Term, that Súber was the general commercial agent of the plaintiff, and, as such, was authorized to pledge the property for the advances made by the defendant; and that, at any rate, Súber was intrusted, as agent, with the possession of the bills of lading, and that his contract, pledging the bills to the defendant for the advances made' .to him, was therefore valid, and a bar to the plaintiff’s recovery, under the provisions of the Act of 1830.
Our late Chief-Justice delivered' the opinion of the Court, which was, that upon neither ground could the defence be sustained; that the instructions to Suber afforded no pretence for ascribing to him the authority of a general commercial agent of the plaintiff, nor were any acts of Suber proved, from which the defendant could be warranted to infer that he possessed such authority; that the defence, under the statute, was also plainly untenable. Suber was not a factor in any sense of the term; he was not an agent for the sale of the property. He had no control of the cotton, nor were the bills of lading intrusted to him for the purpose of giving him such control. It was merely as a clerk that he had obtained and held them; and finally, that had Suber been a factor, the defendant would not have been entitled to hold the cotton for his advances, since he knew, or ought to have known, that the plaintiff and not Súber was the owner, and that the case of Stevens v. Wilson had settled the law, that it is only when advances are made on the faith of the ownership of the property that a pledgee is protected by the statute. Judgment was therefore rendered for the plaintiff for the full value of the cotton.
The latest and most important case is Covill v. Hill, which was *435 decided by the Court of Appeals in 1852, and is fully reported in 2 Selden R. 374.
The action was trover, to recover the value of a large quantity of lumber which the plaintiff had contracted to sell to one B. A. Potter, and had agreed should be consigned to the defendants, merchants at Albany. By the terms of the contract between the plaintiff and Potter, it was provided that the plaintiff should hold the title and possession of the lumber until he should be paid the full amount of the purchase money, with interest, and that Potter, as the agent, and in the name of the plaintiff, should ship the lumber to the defendants, Potter paying the freight, to be sold by them as the property of the plaintiff. The lumber was shipped to Albany in a canal boat, and the master signed and delivered to the plaintiff a bill of lading, stating that he had received the lumber for him, and that it was to be delivered to the defendants, at Albany, in good order. Potter paid to the master $100 on account of the freight, and gave him an order on the defendants for the payment of the residue. The following paper was also delivered to the master:—
“ Elmira, July 2d, 1842. Shipped on board Occidental, H. Banks, master, 48,750 feet white-pine boards and plank, for Albany. A. F. Potter.”
The person who signed the paper was the son of B. A. Potter, and acted as his agent in shipping the lumber.
It did riot appear that the plaintiff had transmitted his bill of lading to the defendants; but on the 16th of July, the lumber, together with the paper signed “ A. F. Potter,” was delivered to them at Albany, and, in answer to an inquiry as to the ownership, they were informed that it was “ the Covill lumber.” They paid the balance of the freight, and sent to Potter their acceptance, which they paid at maturity, for $250, as an advance upon the lumber.
After the lumber had arrived at Albany, an agent of the plaintiff called on the defendants, and informed them that it belonged to the plaintiff, and had been forwarded to them to be sold for him, and he also stated to them the contents of the contract under which it was forwarded. They denied that the lumber belonged to the plaintiff, and asserted that they had received it as Potter’s, and had applied it to his use, averring that he was then indebted *436 to them for advances in more than $5000. Subsequently, and before the commencement of the suit, the plaintiff, by an agent, again demanded the lumber from the defendants, and offered to pay their charges, but not their advances. They refused to deliver it, unless their advances to Potter on account of it were also paid; and they proved on the trial that their advances to Potter, on account of lumber which he had shipped to them at various times, exceeded, by more than $5000, the value of all they had received. The jury, under the instructions of the Judge on the trial, found a verdict for the plaintiff for the value of the lumber at Albany, deducting freight, and a small payment that had been made to the plaintiff by Potter. The Supreme Court denied a motion for a new trial, founded on a bill of exceptions, and the defendants appealed from the judgment.
The positions taken by the counsel for the defendants were, that the plaintiff was not the owner of the lumber, under the contract with Potter, and that if he was so, the defendants were still entitled to retain the lumber, as a security for their advances, under the provisions of the Act relative to principals and factors; but the Court of Appeals overruled all the grounds of defence that were relied on, and by a unanimous vote affirmed the judgment.
Gridley, J.,
who delivered the opinion of the Court, after showing that the plaintiff was the sole owner of the lumber, remarked, that the paper signed by A. F. Potter was not, in any of its features, a bill of lading, and had no transferable quality as such, and that, could it be regarded as a good bill of lading, it was exposed to the fatal charge of being manufactured in fraud of the plaintiff’s rights, and that the defendants, for this reason, and also because they had sufficient notice to put them upon inquiry, of the true ownership of the lumber, were not within the 1st and 2d sections of the Factors’ Act, and they were not within the 3d, because the plaintiff, the true owner, had never intrusted Potter with a bill of lading, nor with the possession of the lumber for sale, or as a security for advances to be made thereon; and to show the necessity of such an intrusting, the learned Judge referred to the leading cases in Meeson & WeJsby, which, in the progress of this opinion, will be fully stated and explained. (6 Mees. & Wels. R. 572; 9 id. 647.)
It appears to us, that the conclusions to be drawn from the *437 decisions in our own Courts that have now been quoted, are, not only that a contract with a factor, to be valid under the provisions of the statute, must be founded on the faith of his ownership of the goods to which it relates, but that this faith must be induced and justified by the documentary evidence of title, specified in the Act, or where no such evidence exists, by the factor’s actual possession of the property; and that in all cases, where the protection of the Act is claimed, it must appear that the documentary evidence or possession, which is relied on, was intrusted to the factor by the owner of the property, and not procured or obtained by a wrongful or unauthorized act of the agent. These conclusions, however, by no means embrace all the questions that arise in the case before us; and to enable us to determine those that remain, a more exact and critical examination of the provisions of the statute seems to be necessary.
The contracts with a factor, which, although void at common law, are rendered valid by the provisions in the third statute, belong to two classes. 1st. Where the transaction is founded on the documentary evidence of title mentioned in the Act; and 2d. Where it rests exclusively on the factor’s possession of the goods, that possession being the sole evidence of his ownership: and these classes, for obvious reasons, require to be separately considered.
I. As to the first. The documents of title specified in the Act are, 1st, a bill of lading; 2d, a custom-house permit; and 3d a warehouse-keeper’s receipt for the delivery of any such merchandise, that is, the merchandise described in the 1st and 2d sections, as shipped from some other port, foreign or domestic. It is perhaps doubtful whether the words “ for the delivery,” etc., ought not to be construed as referring to each of the documents, but this is a question which it is unnecessary to determine.
We begin with these observations, that in our judgment, to render a contract with a factor, made on the the faith of either of these documents valid, as against the owner of the merchandise, it must either appear, on the face of the document, that the factor is the owner, or the terms of the instrument must be entirely consistent with the supposition that he is so; that the document must not merely be exhibited, but must be transferred and delivered to the person advancing his money or credit, in reliance on the evidence *438 of ownership which it furnishes; and that the effect of this transfer must be, either to vest in such person the title to the property, or the exclusive right or means of obtaining the actual possession.
I shall proceed to illustrate the truth of these observations, in reference to each of the documents; and shall also explain the true character of each, and in what sense, and under what circumstances, each may be regarded as evidence of ownership.
The truth of our first observation is too manifest for denial. We have already seen, that when a person, who advances his money or credit to a factor, has notice, actual or constructive, that the latter is not the owner of the goods, to which the contract relates, the transaction is a fraud upon the rights of the owner, which it is certain the Legislature never meant to legalize, and no notice can be more direct than that which is furnished by the terms of the document, from which alone the factor derives his authority; which alone gives him any control or power of disposition.
I. A bill of lading is a written acknowledgment by the master of a vessel that he has received the goods which it describes, from a person named as the shipper, to be transported, upon the terms expressed, to their port of destination, and to be there delivered, either to a person named as consignee, or to the order of the shipper, the consignor. (Abbott on Ship., Story & Perkins, 5 ed., p. 323.)
If the bill names the person, whether consignor or consignee, on whose account and risk the goods are shipped, the statement is equivalent to a declaration that the person so named is the real owner. If there is no such statement, the consignee named is presumptively the owner, and he is so, where the goods are deliverable to the order of the shipper, if the bill of lading in his possession is endorsed specially or generally by the shipper. But if, in this last case, the bill of lading in the possession of a factor, or other agent, is not endorsed by the shipper, so far from being evidence of the ownership of the factor, it is no evidence that he has any power to dispose of the goods at all; as under such a bill he has no right to receive the goods on their arrival, he can have no right to dispose of them in the. interval. (Abbott, 529.)
When a contract with a factor is founded on a bill of lading, *439 which either declares, or is consistent with the supposition that he is the owner, we hold it to be certain, that to render the contract, if void at common law, valid under the statute, as against the owner, the bill of lading must be transferred to, or deposited with, the purchaser or pledgee. The words in the English statute, “ on the faith of such documents or either of them,” have in all the adjudged cases received this interpretation; and although the words in our own statute are somewhat different, we do not doubt that, in order to give effect to the intentions of our Legislature, the same interpretation ought to be given to them. If the factor retains the possession of the bill of lading, and then sells the goods, and transfers the bills to a bona fide purchaser, it would be most unreasonable to suppose that the Legislature intended that the legal rights of such a vendee should be defeated by a prior executory contract; and if the prior contract would be void, as against a subsequent vendee, it seems to us a necessary conclusion, that it would be equally so against the owner. The statute makes no distinction; the contract which it renders valid is so against the world.
The provisions in the 7th section of our statute, as we have before intimated, and cannot but think, place the intentions of our Legislature beyond a reasonable doubt. Those provisions make it a criminal offence, punishable by fine and imprisonment, in a factor or other agent, to deposit any document of title intrusted to him as a security for any money borrowed, or negotiable instrument received by him, and to apply or dispose of the same to his own use. Had it been supposed that, under the provisions of the third section, it would be in the power of a factor, or other agent, to commit the same fraud upon his principal, without depositing, as a security, the document intrusted to him, as the offence would have been just as criminal in its nature, and just as much to be apprehended, it seems to us manifest that its commission would have been guarded against, by rendering it liable to the same punishment. It remains to observe, that at common law, a factor for sale, even when, upon the face of a bill of lading, he was the presumptive owner, had no more right to pledge a bill of 'lading, as a security for advances, than to pledge the goods themselves after their arrival. (1 M. & Sel. 140; 6 id. p. 1; Abbott on Ship. 541, 61.) It is this disability of the fac *440 tor that the statute removes, but removes, it by enabling him to pledge the bill to a person believing him to be the owner, and by that immediate delivery which is essential to a pledge, not by contracting to deliver it on a future day.
As the observations that have now been made, as to the necessity of a transfer of a bill of lading, to render a contract, founded on'its possession, by a factor, valid, under the statute, are just as applicable to the other specified documents of title, they will not be repeated. In respect to each, a transfer is plainly necessary to pass a title, or give an exclusive right of possession. -
A contract, founded on a transfer of the bill of lading, can only be valid when made before the arrival and landing of the goods at their port of destination. After such arrival and landing, the bill of lading is "functus officio." (Russell on Factors, 132, 9 Mees. & Wells. 647,) and unless the goods pass into the actual possession of the factor, it is upon some other document of title that a contract with him, entitled to the protection of the statute, must be founded.
II. The next document mentioned in the Act is, “ a customhouse permit,” and in relation to this, it is material to observe, and necessary to be borne in mind, that when the Act was passed, (1830,) the only permit known to the law, was that which was granted to a consignee, when the goods mentioned in his invoice and bill of lading, bad been duly entered at the custom-house, and the duties thereon paid or secured to be paid; and whether the provisions of the Act, having regard to the intentions of the Legislature in its passage, can be reasonably applied to any other form of permit, (that form being still in use, when the duties are in fact paid,) is one of the questions that it will be necessary to determine.
When a vessel with a cargo arrives from a foreign port, an officer of the customs, an inspector, is immediately placed on board, whose duty it is to prevent the removal of any part of the' cargo until a regular permit for its landing, directed to him, has been-obtained and delivered. This permit is a paper directed to the inspector, and signed by the collector and naval officer of the port; and when the duties have been paid or secured, the following is its form in blank:—“ We certify that A. B. (the importer or consignee,) has paid, or secured to be paid, the duties on the *441 merchandise contained in the following packages, in conformity to the entry thereof of this date; which merchandise was imimported in (blank for name of vessel and name of master), from (blank for port of departure), permission is hereby given to land the same, viz.: (blank for description of packages.)” Such a permit may be justly regarded as prima facie evidence that the person named, as having paid the duties, is the owner of the merchandise, and by its fair interpretation, that it is to him that the permission to land the same is given; but it is not like a bill of lading transferable by its terms, nor is it necessary to hold, that its transfer, for value, like that of a bill of lading, would pass a legal title to the assignee. Still, as it is only by the production of the permit, to the inspector, that the landing and possession of the merchandise to which it relates can be obtained, the transfer of such a document, by a delivery order from the consignee, would seem to be an effectual security for any advance made upon its faith, since it would give to the holder, exclusively, the means and power of obtaining the possession of the property meant to be pledged, and would be a bar to any disposition of it by the factor to any other person.
Hence, although a custom-house permit is not enumerated, in English statute, as a document of title, it .seems, with entire propriety, to have been inserted as such in our own, taking into consideration the meaning and effect of such a permit, when the Act was passed.
It by no means follows, however, that the same meaning and effect can be attributed to a permit for the landing of merchandise of which an entry has been duly made, but on which the duties are unpaid, and consequently, where the permit, instead of authorizing a delivery of the merchandise to the consignee, directs its removal, for safe keeping, to a public or bonded warehouse. To enable us to determine whether such a permit is a document of title, within the meaning of the statute—a document which may be so pledged as to prejudice the rights of the owner to the possession or recovery of the merchandise; a reference to some of the provisions in the Acts of Congress, establishing the warehouse system, and in the regulations of the Treasury under those Acts, is indispensable.
The first of these Acts was passed August 6, 1846, (United *442 States Statutes at Large, vol. 9, p. 53.) It enacted, as a general rule, that all duties on imported goods or merchandise should thereafter be paid in cash; but provided, that in all cases of failure or neglect to pay the duties, the collector should take possession of the goods and deposit the same in one of the public stores, or in a store to be agreed on between him and the owner, importer or consignee, there to be kept with due care, at the charge and risk of such owner, and subject to his order, upon payment of the proper duties and expenses. It then provides for ascertaining the duties, and for securing the same by a bond in double their amount, with sureties to the satisfaction of the collector. This Act was amended by the Act establishing private bonded warehouses, passed 28th March, 1854, (United States Statutes at Large, vol. 10, p. 270,) which gives to the owner the option of having the goods deposited at his expense and risk, either in a public warehouse of the United States, or in a private warehouse used solely for such storage, and approved by the Secretary of the Treasury; and declares, that every such warehouse shall be placed in charge of a proper officer of the customs, who, together with the proprietor, shall have the joint custody of all the merchandise stored therein. Each of the acts authorized the Secretary of the Treasury to establish, from time to time, such rules and regulations, for its due execution, as he may deem to be expedient.
The regulations of the Treasury, after prescribing the form of the entry of goods for warehousing, and of the bond for securing the payment of the duties thereon, make it the duty of the collector, after such bond shall have been executed, to issue a permit, countersigned by the naval officer, to the inspector, for sending the goods to a designated warehouse, in the following form:— “ To the inspector of the port. You are required to send to the bonded warehouse, No. street, (blank for describing merchandise) imported on the day of by in the master, from collector naval officer.” Then follow minute regulations as to the transportation of the goods from the vessel to the warehouse, requiring the officer in charge of the store, to give receipts for the packages as delivered, and to cause such receipts to be returned to- the inspector on board the vessel. (Regulations of the Treasury, ed. 1857, pp. 219, 220, 221, 222, Art. 431, 432, *443 434, 435.) It remains only to add, that the regulations also provide, that, the importer shall exercise the option given to him by law, by designating, upon his entry of the merchandise, the warehouse in which he desires that the same shall be deposited.
It seems manifest, from this statement, that there is very little analogy between a warehouse permit, as it is termed, and that which is given to an importer who has paid the duties; and that nearly all the reasons that have been given for considering the latter a document of title within the provisions of the statute, are wholly inapplicable to the former. It is plainly not necessary that a warehouse permit should be delivered to the importer at all, and if delivered to him, he would hold-it with no other power or trust, than that of an ordinary messenger; namely, that of placing it without delay in the hands of the inspector. The temporary possession would give him no control of the goods, that he would not otherwise possess, and no means of reducing them into his possession, nor is any agency of his required in their landing or transportation, since the whole duty of sending them to the warehouse, is cast upon the inspector. When the importer has made the necessary entry, and has executed the necessary bond, and has designated, upon the entry, the warehouse to which he desires the goods to be sent, he has done all that, until the duties are paid, the law requires or empowers him to do.
It would be absurd to suppose, that under the provisions of the statute, a factor or agent may make a contract that can operate to create a valid pledge of a document of title or of the goods to which it relates, if a similar contract made by the owner himself, would, for the like purpose, be ineffectual and void. Should the owner and importer of merchandise, having in his possession a warehouse permit, desire to borrow money upon the faith of his ownership, we hold it to be manifest and certain, that the mere delivery of the permit, no matter by what order accompanied, would afford no security whatever to the lender. It would neither convey to him a title to the goods, nor the right of possession, nor the means of obtaining possession. All that the lender could do, would be to deliver the permit to the inspector, to enable him to perform the duty of removing the goods to the designated store. The goods when stored, and so long as they remained in store, would be in the actual possession of the collec *444 tor, Subject to the order of the importer, and to his alone, upon the payment of duties and expenses; and upon well-settled principles of law, it would be in the power of the owner, by making the requisite payment, to give to a Iona fide purchaser the immediate possession and an absolute title. We apprehend that the pretence of a prior lien, as created by the transient possession of the warehouse permit, would, in any Court of Justice, be scouted as plainly illegal and bordering on. absurdity.
We state with confidence, that there are only two modes by which a valid pledge of goods of any description can be effected. If the goods are in the actual possession of the owner, that possession must be transferred to the pledgee. If the possession of the owner is merely constructive, the pledge can only be effected by the transfer of such a document as will enable the pledgee, with certainty, at the proper time, to reduce the goods into his own possession, and in the mean time prevent any other person from acquiring legally a hostile possession. Nor can we doubt, that, broad as are the provisions of the statute, the validity of a pledge which a factor attempts to create, must be'determined by the same rules.
III. Let us, then, apply these rules to the next and last document of title mentioned in the statute, “ a warehouse-keeper’s receipt,’’ which, as the law stood when the Act was passed, could only have meant the receipt of the keeper of a private warehouse in which the person named in the receipt has deposited the goods for safe keeping; and applying the words to the case of a consignee or factor, could only mean the receipt of the keeper of the warehouse in which, after the goods have been landed and the duties paid, the factor has elected to place them until he effects a sale. We thus see how exactly the several documents mentioned in the Act correspond with the successive stages of the transaction by which the merchandise is to be placed at the disposition of the factor to whom it is consigned; and in each stage of which, as his possession is merely constructive, some documentary evidence of his title or authority to make a disposition must be produced. We thus have the bill of lading, before the arrival of the goods; the custom-house permit after their arrival, and before they are landed; the warehouse-keeper’s receipt when, having been landed, they are placed in the store of a third person.
*445 It would be a serious mistake, to suppose that the receipt to which the statute refers is a bare acknowledgment, by the keeper of the warehouse, that he has received the goods described from the person named. The transfer of such a receipt, it is obvious, would afford no better security, and no‘more operate to create a valid pledge, than the transfer of a warehouse permit.
By the very words of the statute, the receipt is to be “ for the delivery of the merchandise,”—meaning, as we understand the words, a receipt binding the keeper of the warehouse to deliver the merchandise, upon the surrender of the receipt, to the order of the person from whom he acknowledges to have received it; in other words, to deliver the merchandise to the, holder of the receipt, if duly endorsed to him. The transfer of such a receipt has long been considered by merchants, both in England and in the United States, whether justly or not it is needless to inquire, as transferring the property and, constructively, the possession of the merchandise to which it relates; and hence, it is enumerated as a document of title in the English statute as well as our own. There seems no reason to doubt that the transfer of such a receipt, to a person making an advance to a factor, on the faith of his ownership, would give him a valid security within the provisions of the statute, and a just application of the rules that have been stated. It would enable him at once to reduce the goods into his own possession, or, if he so elected, by surrendering the old, to obtain from the keeper of the warehouse a new receipt of the same tenor in his own name and favor. His lien thus perfected, no subsequent act of the factor could displace.
But the remarks that have been made are only applicable to the receipt contemplated by the Legislature; a receipt by the keeper of a private warehouse, in which the importer has himself deposited the merchandise it describes. When the goods are deposited in a bonded warehouse, whether public or private, neither the Acts of Congress, nor the regulations of the Treasury contain any provision by which an authority is given to the' collector, or an officer of the customs in charge of a warehouse, or the proprietor of a warehouse, to issue a receipt or certificate of the like character, and to which the same effect may be attributed.
So long as the goods remain in the warehouse, we have already seen, they stand in the name, and are subject, alone, to the order *446 of the importer—the payment of the duties "and charges being a condition precedent to the exercise of his power; nor is there any provision by which, during this period, his constructive pos- - session can be altered, nor consequently, his power of disposition be legally affected.
It is true, that when the goods are in a warehouse belonging to the Government, the regulations of the Treasury authorize the collector and naval officer, upon the written application of the importer, to give him their joint certificate, that the goods entered by him for warehousing, describing them by their marks and numbers, are deposited.in a designated warehouse; but the certificate contains no obligation or promise to deliver the goods, to the order of the importer, upon the return of the certificate, (Regulations of Treasury, p. 224, Art. 441,) and when the goods are in a private warehouse, no similar authority is , given to the officer and proprietor, who, under the collector, have the joint custody of the merchandise there deposited. It may be, that without an express authority, such a certificate may be given by them, or either of- them; but if this be admitted, it is manifest that the delivery by an importer, to a third person, of a paper, amounting to no more than the declaration of the fact of the storage of the merchandise, could never operate to change the property or the possession. We apprehend, that no Court would hold such a certificate, no matter by whom given, to be a receipt for the delivery of the merchandise, within the meaning of the statute.
There are, however, other provisions in the regulations of the Treasury which may be thought to have a bearing upon the questions we are to decide, and to which it will, therefore, be proper to advert.
Where the goods in a warehouse are intended to be withdrawn for consumption, the regulations provide that a new entry, called a withdrawal entry, shall be made; and if the importer " wishes to enable a third person to withdraw the goods, upon the payment of the duties and charges, he may, by a certificate, to be signed by himself, and endorsed upon the entry, authorize the person named therein to withdraw the goods described in the entry. The withdrawal entry must then be compared with the original warehouse entry, in the collector’s office, and with its *447 duplicate in the naval office, and if found to be correct, a verified estimate of the duties must be endorsed upon the duplicate entry; and the amount of the duties, thus ascertained, having been paid, a permit for the delivery of the goods, from the warehouse, will then be given, either to the importer or the person named in his certificate of authority. (Regulation of the Treasury, pp. 225, 226, Art. 442.) It is evident, in reading these provisions, that they refer, in its different stages, to one transaction. They evidently do not contemplate, that the new entry shall be made, nor an authority to a third person be given, except with a view to the immediate payment of the duties, and the actual withdrawal of the goods. But it, doubtless, may happen, and it is not improbable, does frequently happen, that after the withdrawal entry has been made, and an authority to a third person been given, the duties may be suffered to remain unpaid, and the goods to continue in the warehouse. It máy be said, that in such a case, if the person claiming, under the authority, is a purchaser or pledgee, it ought to be held, that he is constructively in possession of the goods, and has acquired a property therein, absolute or special, according to the nature and terms of his contract with the importer. But, although these questions may well arise, when the importer of the goods is also the owner, between him and the person whom he has authorized to withdraw them, or between the latter and a subsequent purchaser, yet we do not see how they can arise when the importer is merely a factor, and the controversy is between the person whom he has authorized to withdraw the goods, and the innocent owner, to whom these proceedings of his agent were wholly unknown, and who would be defrauded by holding them to be valid. We cannot suppose that it would ever be contended," that an authority so given, by a fraudulent agent, even where such agent is believed to be the owner, is a document of title, within the meaning of the statute. It would be a perversion of language and of reason, to say, that a certificate, signed by the factor himself, in the books of the custom-house, is a warehouse-keeper’s receipt for the delivery of the goods. It is no more such a receipt than it is a bill of lading or a custom-house permit; and we hold the proposition to be too clear for argument, that when a factor attempts to pledge the goods of his principal, by any instrument, or the transfer of any *448 instrument, not mentioned in the statute, it is by the rules of the common law, and by those alone, that the validity of the pledge, as against the owner, must be determined. There are no general words, in the statute, embracing any other evidences or symbols of title than those which it enumerates.
The only observations that require to be added, relative to contracts with a factor, founded on his possession of a document of title, are these:—
First.—That to render the contract valid, as a pledge under the third section of the statute, it must appear that the document was transferred when the advance, it was intended to secure, was made. The acts must be simultaneous. And next—It must appear, that the document, although in other respects, such as the statute describes, was intrusted to the factor by the owner of the goods to which it relates.
1st. It is plain, that when there is an interval of time between the advance of money or negotiable securities, and the transfer, to the lender, of a document of title, the contract, although a pledge of the document is meant to be created, is purely executory, and in reality is not founded on the security of the document, but merely on the promise that this security shall be given. Hence, although the advance may constitute a present debt, and the promise be fulfilled on a subsequent day by the transfer of the document, the contract, if valid at all against the owner, is only so under the fourth section of "the statute, as a deposit to secure an antecedent debt, and is only valid to the extent which that section authorizes. In England, the law is thus settled by many decisions; in one of which, although the advance was made on a Saturday, and the document, relied on as its security, was transferred on the following Monday morning, it was held, that the contract was not protected under the second section in the Act of. Parliament, which corresponds substantially, it has been shown, with the third section in our own statute.
We see no reason to doubt, that the cases to which we refer were properly decided. Indeed, as a transfer of possession is in all cases essential to a pledge, there seems no escape from the conclusion that they were so. (Bonzi v. Stewart, 4 Mann & Gran. R. 295; Taylor v. Kymer, 3 Barn. & Ad. R. 320; Taylor v. True-man, 1 Mood. & Mal. R. 453; Ross v. Willis, Dans. & Lloyd Mercantile *449 Cases, 19.) Upon the same principle, if the original advance, made by a person claiming to be the pledgee of a document of title, was made in negotiable securities, which, when they fell due, were renewed by the substitution of other securities of the like character, and the application of their proceeds to the payment of the first, the renewal is not considered as an advance upon the faith of the document, although it may then be in the possession of the lender; but the question, whether the contract was valid, under the third section of the statute, must be determined by the facts as they existed at the time of the original advance. Hence, if this advance preceded the transfer of the document, the pledge, as against the owner, is void. (Phillips v. Huth, 6 Mees. & Weis. R. 600; Taylor v. Truemann, 1 Mood. & Mal. R. 453.) So, where the original advance was upon securities belonging to the factor himself, which the lender gives up, and receives in exchange a document of title of goods belonging to the principal, the exchange does not create a pledge protected by the statute, as it was not upon the security of the document that the advance was made. (Same cases, 3 Russell on Factors, pp. 132, 133.)
2d. We have seen that it was decided by the Court of Appeals, in Covill v. Hill, that where an advance is made to a factor upon a document of title, it must be proved that the document was intrusted to him by his principal; but the rule is there laid down in general terms, and it is therefore necessary to consider more particularly in what cases, and under what circumstances, the acts of the owner may be regarded as evidence that he had intrusted the factor with the possession of a document of title, which is alleged to have been so pledged, to bring the contract within the protection of the statute.
This was the principal question in the important case of Phillips v. Huth, (6 Mees, and Welsb. R. 572,) in which it was very fully and ably discussed by the counsel, and, in a very elaborate and lucid judgment, determined by the Court.
The action was for money received by the defendants to the use of the plaintiffs, and the claim was founded, in a great measure, on the following facts:—
The plaintiffs had placed the bills of lading of two cargoes of tobacco, of which they were the owners, in the hands of Warwick & Claggett, commission merchants, as their factors, for sale, and *450 the latter were thus enabled to enter the cargoes at the customhouse in their own name, and to obtain in their own name certain dock warrants, which are a document of title specially mentioned in the Act of Parliament. They pledged these warrants to the defendants, Huth & Co., as a security for advances made to themselves, of more than £20,000 sterling, and subsequently became bankrupt, leaving the debt thus contracted wholly unpaid. Huth & Co. sold the tobacco, and after deducting their advances and charges, paid the balance into Court; and the question was, whether the plaintiffs were not entitled to recover the whole proceeds of the sale. The jury, upon the trial, found a verdict for the defendants, and the case was before the Court upon a motion to set aside the verdict, upon the ground of a misdirection of the Judge, and as against evidence; and it was to the question, whether the plaintiffs had intrusted "Nyarwick & Claggett with the possession of the dock-warrants, that the arguments of the counsel were chiefly, but not wholly directed. The contention on each side was substantially the same as that of the learned counsel in the case before us. It was insisted, on the part of the plaintiffs, that no document ought to be regarded as intrusted to the factor which the owner had not delivered or transmitted to him, or which' the owner had not the opportunity of seeing, so as to enable him to make it in such a manner as to indicate his own title to the property; while on the part of the defendants, it was contended, that in judgment of law, every document must be deemed to have been intrusted to the factor, which his possession of a bill of lading, delivered or transmitted to him by the owner, enabled. him to obtain.
Neither of these constructions was adopted by the Court.
The first was rejected as too strict and literal, and limiting the authority of the factor within milch narrower bounds than it was reasonable to believe that the owner meant to impose; the second, as going beyond any meaning that could justly be attributed to the word intrusted,” and inconsistent with the probable intentions of the Legislature in the use of the term.
The conclusion to which the Court arrived was, that not only must every document be deemed to have been intrusted to the factor, which the owner, personally or by an agent, had delivered or transmitted to him, but that the term was justly applicable to *451 every document which there was evidence to show that the owner intended that the factor should possess at the time, and in the form in which he obtained its possession ; and that this intention of the owner, when not expressly proved by his instructions, might be inferred from the facts, that the document was one which it was necessary that the factor should obtain, to enable him to sell the goods, or that he was justified in obtaining, by the ordinary course and usage of trade, in reference to the sale of goods of the description of those that were consigned to him; or, expressing the proposition in more general words, that the document was obtained by the factor in the proper and ordinary mode of discharging the duties of his trust. Upon the ground that the verdict of the jury was unsupported by any evidence, that the plaintiffs intended that their factors, Warwick & Claggett, should procure the dock warrants which they pledged, it was set aside and a new trial granted.
Exactly the same questions arose, and were again fully discussed in a case, which subsequently came, on a writ of error, before the Court of Exchequer Chamber, and in which the facts were substantially the same as in Phillips v. Huth, (Hatfield v. Phillips, 9 Mees. & Wels. R., 647.) The Court expressing its conviction that the question had been rightly determined in Phillips v. Ruth, and stating some further reasons in support of the decision, affirmed the judgment for the plaintiffs that had been rendered in the Court below, and subsequently this judgment of affirmance was itself affirmed in the House of Lords, upon a consultation of all the Judges, and by their unanimous advice. (Hatfield v. Phillips, 12 Clark & Finelly, R. 343.)
Had we entertained any doubts as to the soundness of the doctrine thus established, they must have been yielded to the force of the authorities that have been cited. But we have no such doubts. When an agent fraudulently pledges a document, which in reality was intrusted to him by his principal, it is just that the latter should bear the consequences of an act which the very form and terms of the document enabled the agent to commit. But when the document is procured or manufactured by the agent himself, in violation of his trust, it is not just to visit upon the principal the consequences of an act which he had no reason to anticipate, and which was not the result of the confidence that *452 he reposed, and of the means that he had furnished. It is impossible to say, that a document procured by the fraud of the agent himself, was intrusted to him by his principal, and to cast upon the principal a loss, resulting from the" fraudulent use of such a document, would be as unjust, as all would confess it to be, had the document been forged or fraudulently obtained.
We shall proceed, then, to apply the term “intrusted” in that reasonable definition, which has been given to it in England, and which we accept, to the documents of title mentioned in our own statute. A bill of lading, which has been delivered or transmitted by the owner, or by his direction, to a factor or other agent, is manifestly a document with the possession of which the agent has been intrusted by his principal; so also is a custom-house permit for the landing of the goods, when the duties have been paid; for this is a document which the factor must have, to enable him to obtain the possession of the goods, and perform his own duty in selling them; so, where the factor has no warehouse of his own, in which the goods may be stored, the receipt of the keeper of the warehouse, in which he deposits them until he can effect a sale, may be termed a necessary document, and is certainly a document that the usage of trade justifies the factor in obtaining. But without evidence of the actual intentions of the owner, it is certain that we cannot apply these observations, either to a warehouse permit, or to the receipt of the keeper of a bonded warehouse, even could it be admitted that each of these documents may be so framed and expressed, as to be the subject of a pledge, creating an immediate and valid lien upon the goods to which it relates. Hence, unless there is evidence that the factor was expressly instructed or authorized to bond the goods on their arrival, or was warranted in doing so, by a previous course of dealing between him and the owner, or by a known usage in relation to the storage and sale of similar goods, it would be impossible to say, that either a warehouse permit or a bonded storekeeper’s receipt is a document that was intrusted by the owner, within the meaning of the statute. In the absence of such proof, of the intentions of the owner, a Court of Justice would be compelled to say, that the document was obtained by the factor, not in the execution, but in violation of his trust.
II. We pass now to a brief consideration of the second class of *453 the cases in which the statute gives validity, as against the owner, to a contract with a factor, or other agent, for the sale or disposition of the goods intrusted to him. The words of the statute apply to “ every such factor or agent, not having the documentary evidence of title, who shall be intrusted with the possession of any merchandise for the purpose of sale, or as a security for any advances to be made or obtained thereon.”
We do not think it necessary to hol'd that the words “ not having the documentary evidence of title,”' are to be strictly and literally construed, so as to invalidate every contract made by a factor in the actual possession of the merchandise intrusted to him, if he has at the time in his possession some documentary evidence of title. If a factor who has paid the duties, and deposited in his own store the goods consigned to him, retains in his possession a duplicate bill of lading, we incline to believe that this fact would not be held to vacate a contract for the sale or disposition of the goods that would otherwise be valid. The words used are indeed susceptible of this construction; but it would hardly be reasonable to suppose that such was the intention of the Legislature. The words, “ not having the documentary evidence of title,” may probably refer to the cases in which a document of title, as evidence of the ownership, real or apparent, of the factor, is no longer necessary to enable him to transfer the title or possession of the goods intrusted to him, and consequently are applicable—although the documents of title may be still in his possession—if like a bill of lading, after the landing of the goods, they have performed their office, and are no longer of use or value as instruments of transfer.
Whichever construction of these words be adopted, it is clear that the possession of the factor, in the clause we are considering, means an actual, as distinguished from a constructive possession. For where the goods are in the actual possession of a third person subject to a lien, and that of the factor is a merely constructive possession, he must necessarily have documentary evidence of his title or authority to enable him to control their disposition. Hence the propriety of the distinction which the statute makes between the two classes of cases, in which it gives validity to the contract of a factor; those in which his possession being merely constructive, a change of the title or possession of the goods in *454 trusted to him can only be effected by means of the transfer and delivery of a document of title; and those in which his possession being actual, the necessary change may be effected by the transfer and delivery of the goods themselves.
We have seen that the English statute does not embrace the case of the actual possession of the factor, but is limited to contracts resting solely on documentary evidence; and it was this defect, or supposed defect, that our statute was doubtless meant to supply, by making the actual possession of the factor sufficient evidence of his ownership, to those who, upon the faith of such ownership, might become the purchasers or pledgees of the goods intrusted to him for sale.
The observations of Lord Denman, who delivered the judgment of the Court in Hatfield v. Phillips, will illustrate the distinction between constructive and actual possession, and may properly be adduced in confirmation of the remarks that have been made. His language is, that when the factor “ receives the goods into his own warehouse, it is clear that neither by the common law, nor by the statute, (6 Geo. IV., c. 94,) can he pledge the goods, nor will there, then, be any document indicative of title which can bring him within the second section of the statute. If they remain in the dock warehouse, and are only in his constructive possession, he will be authorized to do such acts and procure such documents as are necessary and proper to enable him to sell the goods. To this extent, and no further, is he intrusted, in the absence of any specific instructions or authority,” (9 Mees. & Wels. R. 609.)
These last remarks, it is obvious, are just as applicable under our statute when the goods are in a bonded warehouse, and it is with these we shall conclude our exposition of those provisions, in section third of our Act, that we conceive to have any bearing upon the questions we are to decide.
The general conclusions from this discussion, omitting subordinate parts, and confining ourselves to the contract of deposit or pledging, are these:—
First. That the constructive possession of goods, by a factor for sale, can only be changed in favor of a pledgee, by the transfer and delivery to the latter of some one or more of the documents of title mentioned in the statute.
*455 Second. That to render the contract valid as a pledge, it must also appear that the document transferred,—if otherwise, such as the statute describes,—had been intrusted to the factor by the owner of the goods, and that, in the application of this rule, the term “ intrusted” must be understood, in the sense that has been given to it by the decisions to which we have referred.
Third. That the possession of a factor, “ not having the documentary evidence of title,” that can alone enable him to create a pledge, valid as against the owner, is an actual, as distinguished from a constructive possession; and hence, it is only when such is the character of his possession, and only by the transfer and delivery of the goods themselves, that a valid pledge, under this provision in the statute, can be effected; and,
Lastly. That in all cases, to render the contract valid, the change of possession, whether constructive or actual, must be made at the time the advance is made, which the pledge is intended to secure.
We shall now proceed to apply the views that we have deemed it necessary so fully to develop and sustain, to the transactions between the factors, Mosquera & Co., and the defendants, Hitchcock & Reading, that have given rise to the present controversy; taking the facts from the answer of those defendants, but giving such an interpretation to the statements in their answers as may render them consistent with the Acts of Congress, and the regulations of the Treasury, to which we have referred.
The defence of Hitchcock & Reading is rested upon five successive advances, which they allege to have made in their own promissory notes, which they have since been compelled to pay, at different times and in different sums, to Mosquera & Co., upon the security of distinct parcels of the bark in controversy, and upon the faith that Mosquera & Co. were the owners of the property they undertook to pledge. It is true, that two other advances are stated in their answer; but as it is apparent that these were made merely by a renewal of notes before given, it is certain, and was very properly admitted, upon the argument, that they made no alteration in their rights, and no addition to the security which they then held. Unless there was a valid pledge for the advances, when originally made, none was created by their renewal.
The following are the facts in relation to the first and largest *456 advance, as stated in the answer: That early in July, 1856, Mosquera & Co. applied to the defendants for a loan or advance of their negotiable promissory notes, to the amount of $32,000, and they, the defendants, made this advance, in eight promissory notes for different sums, payable, each 60 days after date, and dated respectively the 1st, 2d, 3d, or 5th of July, 1856, upon which last day the notes were delivered; that this advance was made upon the pledge and security of two distinct parcels of bark, one of 408 ceroons, all of which are claimed by the plaintiffs, and the other of 438 ceroons, of which 366 are claimed by the plaintiffs; that the 408 ceroons, when the advance was made, were in the possession, in store, of Mosquera & Co., and even stood in their own names, at their own risk, and subject to their own order, and that the 438 ceroons were then on their way to Mosquera & Co., from Santa Martha, and arrived at this port on or about the 12th day of July, 1856; that Mosquera & Co., at or about the time they received the advance of the notes before mentioned, transferred to the defendants the 408 ceroons, with authority to sell the same, and also gave to them a letter of consignment, of the 438 ceroons, then about to arrive, with like authority to sell the same. That upon the arrival of the 438 ceroons, Mosquera & Co. obtained the usual custom-house permits, for the landing and storing the same, and delivered them to the defendants,.and that - the bark was, thereupon sent to one of the public stores, and was there stored for the account, and at the risk of the defendants, and the same has since been, and is still, held in store for their account, and subject to their order. These, together with the averments that the defendants Hitchcock & Reading, when they advanced their promissory notes, believed that all the ceroons of bark, so pledged, were owned by Mosquera & Co., and had no knowledge, information or notice that any of them belonged to the plaintiffs, or that the plaintiffs had any interest therein, are all the material allegations in their answer, in relation to the first advance, by which they claim to have acquired a lien, which the statute has rendered valid, against the claim of the plaintiffs, as owners.
It is manifest, however, that they acquired no such lien upon either of the parcels of bark, that they allege to have been pledged to them, if we have rightly construed the provisions of the statute, and the decisions and authorities that we have cited *457 are to be respected and followed. The facts relied on are no evidence of a contract to which the statute has given validity, so as to exempt the defence from the application of the rules of the common law.
First.—As to the 408 ceroons. If the allegation, that they were in the possession of Mosquera & Co., in store, and, were at the time of the advance, transferred to the defendants, could be understood as meaning that they were in the actual possession of Mosquera & Co., in their own store, and that this actual possession was transferred to the defendants, as Mosquera & Co. had then no documentary evidence of title, the contract might well be sustained as a valid pledge within the meaning of the statute. But these allegations in the answer cannot be thus understood; for, in this sense, they cannot be true. The 408 ceroons, it is admitted, in all the answers, are a part of the 1539 ceroons shipped and claimed by the plaintiffs, and all of which, it is also admitted, are now in one of the public or bonded warehouses in the city. The 408 ceroons were, therefore, it is certain, in a bonded warehouse, when the attempt to pledge them was made, or they would not be there now. If they had once been withdrawn, upon the payment of the duties, there is no provision of law that could have enabled Mosquera & Co., or the defendants, to claim a return of the duties, and place the goods again in bond. These ceroons, therefore, were only in the constructive possession of Mosquera & Co., when the defendants made the advance, and it is not averred or pretended that this possession was changed by the transfer and delivery of any document of title mentioned in the statute; and it has already been shown, that it is only by such a transfer that the constructive possession of the factor can be changed, and a pledge of the goods, as against the owner, be created. If, by the allegation, that Mosquera & Co. transferred these ceroons to the defendants, we are to understand that they made the transfer, and gave to the defendants an authority to sell the bark, to reimburse their advances, by an instrument in writing, the allegation, thus understood and admitted to be true, would, in no respect, alter the case in favor of the defendants. Whatever might have been the legal effect of such an instrument, as between the parties, had Mosquera & Co. been the owners of the bark, its execution could not operate, either to alter the constructive possession of Mosquera *458 & Co., as importers, or to divert the title or affect the rights of the plaintiffs, as owners. Under the regulations of the Treasury, the bark still remained on the books of the custom-house, subject to the order of Mosquera & Co. alone, and this constructive possession they still held, in the character in which alone they had acquired it, as factors, for the plaintiffs.
Second.—As to the 438 ceroons, the facts are, if possible, still stronger against the defendants. They made the advance of their notes before the arrival of the bark, not upon the transfer and pledge of any document of title, but merely upon the verbal assurance of Mosquera & Co., that upon the arrival of the ceroons, the required security would be given. Before such arrival, no pledge of the bark, creating a lien, valid against the plaintiffs, could be made, otherwise than by an indorsement and transfer of the bill of lading, and it is not averred or pretended, that any such indorsement and transfer was made. Kor is it even alleged, that Mosquera & Co. had any bill of lading in their possession, when they received the advance. It is true, that it is alleged, that Mosquera & Co. gave to the defendants a letter of consignment of the 438 ceroons, then about to arrive; but, what is meant by a letter of consignment, which is not a bill of lading, and which is given before the arrival of goods, by a consignee, and not a consignor, we do not profess to understand. It is sufficient to say, that whatever may have been the terms, or legal effect of the document to which this novel appellation is given, it was not a document mentioned in the statute; it was not intrusted to Mosquera & Co. by the plaintiffs; nor could its execution have created a lien upon the bark before its arrival. Had Mosquera & Co. sold the bark to a purchaser, in good faith, and transferred to him the bill of lading, we cannot doubt that the vendee would have acquired an absolute title.
The next allegation, that upon the arrival of the 438 ceroons, Mosquera & Co. obtained the usual custom-house permits for the landing and storing of the bark, and delivered them to the defendants, were much relied on by the counsel for Hitchcock & Reading, upon the argument; yet, it is quite certain, for many reasons, that the delivery of these permits created no lien upon the goods, to which they related.
First.—The permits were delivered a week, or longer, after *459 the defendants had advanced their notes. Hence, if they were a security at all, which we cannot believe, they were so for the antecedent debt, only to the extent of any balance then due to Mosquera & Co.
Second.—As the bark was immediately sent to a public store, such permit must have been a warehouse permit; and, therefore, not a custom-house permit and a document of title within the meaning of the statute.
Third.—The delivery of these permits, gave to the defendants no control whatever over the bark; it gave to them neither a title, nor a right of possession, nor the means of obtaining possession. All that they could do with the permits, was to deliver them to the inspector, on board the vessel, to enable him to send the packages they described to the designated warehouse. The permits, had they chosen not to deliver them, would, in their hands, have been of no use or value whatever. The only consequence would have been, that as the vessel must have been unladen, and the duties were unpaid, other permits, for landing the bark and sending the packages to a bonded warehouse, must have been issued.
Lastly.—Had these permits been documents of title, within the meaning of the statute, and as such capable of being so pledged as to create a lien upon the merchandise they described, we have no right to say, that they were documents intrusted to the factors, Mosquera & Co., by the plaintiffs. When goods are consigned to a factor for sale, the presumption is, that he is to pay the duties as well as the freight, take the goods into his own possession, and bring them into market, for sale, immediately on their arrival; and we apprehend, that this presumption can only be repelled by evidence that the consignor intended that the goods should, upon their arrival, be placed in a bonded warehouse, to be withdrawn, for consumption, on a future day, or sold, subject to the duties, while under bond. There are no allegations, in the answer, that Mosquera & Co. were instructed by the plaintiffs to bond the goods, upon their arrival, or that the proceeding was warranted by any previous course of dealing between the parties, or by any known usage of trade in relation to merchandise of the like description ; and in the absence of such evidence, of the intentions of the plaintiffs, and following the doctrine in Phillips v. Suth, *460 we hold ourselves bound to say, that the procuring of -the warehouse permits, by Mosquera & Co., was a proceeding not authorized by the plaintiffs, as owners, and contrary to their own duty as factors. Hence, could the warehouse permits be otherwise regarded as documents of title within the statute, they were procured by the wrongful act of the factors, and were not intrusted to them by the owners.
The allegation, which follows that of the delivery of the permits, that the 438 ceroons were sent under the permits to one of the public stores, and were there stored, for the account, and at the risk of the defendants, Hitchcock & Reading, and have ever since so remained, subject to their order, cannot be true, in the sense that the words naturally suggest, unless we suppose, that, in this instance, the provisions of the Acts of Congress, and the regulations of the Treasury, to which we have before specially referred, were wholly disregarded. As Mosquera & Co. held the invoice and bills of lading, it is certain that they made the necessary entry of the bark at the .custom-house, as importers, and we have seen that the Act of Congress, the first warehousing bill, expressly provides that all goods entered for warehousing, shall be stored and kept at the charge and risk of the importer, and subject at all times to his order, upon payment of the duties and expenses ; and by the regulations of the Treasury, this constructive possession of the importer must remain unchanged, until the withdrawal entry is made, and an authority to withdraw the goods is given, by the importer, by an indorsement on the entry, to some other person. It is impossible, therefore, that the 438 ceroons could have been placed originally, by any entry on the books of the custom-house, to the account of the defendants, Hitchcock & Reading, so as to be, from that time, at their risk, and subject to their order, unless we impute to the officers of the custom-house, including the collector himself, a gross violation of their duties, as prescribed by law, and such an imputation we have assuredly no right to make. We must, therefore, understand the allegation, that the ceroons in question, were stored for the account, at the risk, and subject to the order of the defendants, as meaning only, that such was the understanding and agreement of the parties themselves; not that a constructive possession was thus vested in the defendants by any act or proceeding of the *461 officers of the customs, or by any entry on the books of the custom-house ; and, thus understood, the allegation is plainly immaterial. We add, that even had the allegations been true in the sense, which they obviously suggest, and perhaps were meant to be understood, they would not have affected the rights of the plaintiffs, since their truth would have been no evidence, that Hitchcock & Reading acquired a constructive possession of the cerootis claimed by the plaintiffs, by the transfer, and upon the security of any document of title mentioned in the statute, and intrusted, by the plaintiffs, to Mosquera & Co. The truth of the allegation would have been evidence, only, of a fraud committed by the factors upon the owners, not resulting from any confidence which the owners reposed, and a constructive possession thus acquired by pledgees, is no more protected, by the statute, than the rules of the common law.
The observations that have now been made, in relation to the first advance made by the defendants, Hitchcock & Reading, will be found to apply, in a greater or less extent, to all their subsequent advances; and hence, in relation to their title, nothing more will be necessary than a statement of the facts, as alleged in their answer, and the conclusions that, according to our views of the law, are necessary to be drawn, will be at once perceived.
The material allegations, in their answer, in respect to their second advance, are th.ese: That on or about the 15th of July, 1856, Mosquera & Co. applied to the defendants for another loan or advance of their negotiable paper, to the amount of $20,000, upon the security of other 342 ceroons of bark, specified in a custom-house permit, which they then held, and upon the further security of other 300 ceroons, which, they stated to the defendants, were then being landed from a vessel in this port, the whole 642 ceroons being parcel of the 1539 now in store, and claimed by the plaintiffs; that the defendants, upon the security and pledge of the same bark, and upon the faith that Mosquera & Co. were the owners thereof, then advanced and delivered to Mosquera & Co. their promissory notes, amounting in the aggregate to $20,000, and that Mosquera & Co., to secure the payment of the notes, then transferred and delivered to the defendants the custom-house permit, for the 342 ceroons, and consigned to them the 342 ceroons, and the 300 ceroons, and gave them authority to *462 sell the same, and agreed to procure the necessary permit for landing and storing the 300 ceroons, and to procure all the ceroons, to be stored in the name, for the account, and subject to the order of the defendants; and, after such storage, to procure and deliver to the defendants the usual warehouse-keeper’s receipts therefor.
Stopping here, it is manifest that no distinction, in law, can be stated between this case and the first advance. The permit for the 342 ceroons must, and could, only, have been a warehouse permit; it was, therefore, not the custom-house permit mentioned in the statute, and alone intended by the Legislature. It was not, from its terms, capable of being made the subject of a pledge, creating a lien upon the property it specified, and it was not intrusted to Mosquera & Co. by the plaintiffs. As to the 300 ceroons, the advance was not upon them, as a present security, but merely upon a promise that, on a future day, the security should be given. The contract, therefore, under the 3d section of the statute, was, in respect to the plaintiffs, clearly void.
The answer, however, proceeds to aver, that some days thereafter, and about the 5th of August, Mosquera & Co., in pursuance of their agreement, procured, and delivered to the defendants, a warehouse-keeper’s receipt, signed by Matthews & Romaine, keepers of the bonded warehouse, Nos. 9 and 11 Bridge street, for the 438, 342 and 300 ceroons above-mentioned, making, in all, 1080 ceroons, and that the receipt stated, that all were held, for the account, and at the risk of the defendants, and that the 438 ceroons and the 342 ceroons were then transferred to the defendants ; and it was upon these allegations, that the counsel for the defendants laid much of the stress of their argument. They earnestly contended, that the necessary effect of the receipt was to transfer, to the defendants, the possession, actual or constructive, of all the ceroons that it embraced, so as to give them, at least, from the time of its delivery, a valid lien upon, and a full power of disposition over the whole.
We do not think so. It does not appear who were the persons who signed the receipt, whether the proprietors of the warehouse, or the custom-house officers in .charge; but whoever they were, it is quite certain, that they had no authority, by law, to give such a receipt; that they violated their duty in giving it, and *463 that the facts, which it states, were not, and could not he true. By no proceeding authorized by law, could the bark, mentioned in the receipt, be placed to the account, and at the risk of the defendants, and be so held, either by the signers of the receipt or by any other persons, so long as it remained in a bonded warehouse. So long as it so remained, the actual possession was in the collector, the constructive in Mosquera & Co., as importers, and it was only with the assent, and by some act of the collector, that the possession, actual or constructive, could be changed. To procure such a receipt, was a fraud upon the rights of the plaintiffs, and it would be monstrous to say that a receipt, procured and manufactured by factors, for their own purposes, is a document of title, within the statute, intrusted to the factors, by the owner. We do not hesitate to reject wholly the supposition, that by the delivery, to the defendants, of a receipt, so procured, the rights of the plaintiffs, as owners, were, or could be affected.
The advances that remain—the 3d, 4th and 5th—will not long detain us: Like the preceding, they were all made in the negotiable notes of the defendants, and upon the security, it is affirmed, of different parcels of the bark in controversy.
The third advance amounted to $16,000, and was made on the 6th of September, 1856, on the pledge, it is alleged, of 239 ceroons, 48, only, of which belonged to the plaintiffs; that the said 48 ceroons were transferred by Mosquera & Co. to the defendants, with a large quantity of other bark, in the month of April, 1856, in pledge, and as security for the re-payment of the notes of the defendants, to the amount of $40,000, which, at that time, they advanced to Mosquera & Co.; that at this time, Mosquera & Co. had the said 48 ceroons in possession, and in store in this city, stored in their names, at their risk, and subject to their order, and that the same were not withdrawn from the possession of the defendants, by Mosquera & Co., but remained in such possession, until the 6th day of September, when the defendants advanced their notes for $16,000, as above mentioned, upon the pledge and security thereof.
It seems manifest, that these statements are wholly unsatisfactory. It appears to us, that they furnish no evidence whatever of a contract of pledge binding on the plaintiffs. They amount to no more than a general allegation, that the 48 ceroons were *464 transferred and pledged to the defendants, as a part of their security, for the advance, which they then made; but we cannot doubt, that the defendants, in order to bring themselves within the protection of the third section of the statute, were bound to show, that the transfer was made, and the security was given, by means of some one or more of the documents of title specified in the Act. Hot only, however, does the answer contain no such averment, but it is certain, that as the ceroons were placed in a bonded warehouse immediately upon their arrival, and as the advance of the defendants was not made until they were in store, no such averment "could, with truth, have been made; there could have been no transfer of the bill of "lading, for that had performed its office, and could no longer pass a title, by its indorsement; as the permit issued by the custom-house, for the landing of the bark, was necessarily a warehouse permit, it was not the permit that was alone intended by the statute; and if a receipt was given by the keepers of the bonded warehouse, it was not a receipt for the delivery of merchandise, within the meaning of the statute. It was a document which the keepers had no right to give, nor Mosquera & Go. any right to obtain—a document not ■authorized by the Acts of Congress, nor warranted by the provisions of the statute, but issued and procured, in contravention and fraud, of the rights of the plaintiffs as owners.
The fourth advance was of $10,000, and was made, it is alleged, on or about the 18th of September, 1856, upon the pledge and security of 316 ceroons, only 24 of which are included in those owned and claimed by the plaintiffs: The allegations are, that the whole 316 ceroons were then stored in the name, at the risk, and subject to the order of Mosquera & Co., who at the time they received the advance, delivered to the defendants a warehouse-keeper’s receipt for the whole of the bark so stored, and gave them authority to sell the same, and that the same has since remained stored in the name, and at the risk, and subject to the order of the defendants.
Ho observations here seem to be necessary. The warehouse-keeper’s receipt, so far as the rights of the plaintiffs are concerned, was inoperative and void, and the averment, that the bark has since remained in store- in the name, at the risk, and *465 subject to the order of the defendants, for reasons that have been before fully given, cannot be true.
The fifth, and last advance, was made on or-about the 22d of September, 1856, to the amount of §5000, upon 150 ceroons of bark, of which 51 were the property of the plaintiffs. The whole 150 ceroons were then in one of the bonded warehouses in the city, subject to the order of Mosquera & Co., who, at the time of the advance, made a consignment, to the defendants, of the ceroons, with authority to sell the same, and that the 51 ceroons have, since that time, remained stored in one of the bonded warehouses in the city, in the name, and at the risk, and subject to the order of the defendants.
Here, also, no remarks can be necessary, to show the entire invalidity of the transaction. It does not appear to have been founded upon any documentary evidence of title whatever, and, we know, could not have been founded upon the faith and transfer of any one of the documents of title that are alone specified in the Act. To hold, that the title of the owner may be divested, or his rights be affected by any other means than such a transfer, when the possession of the factor is merely constructive, would be, in our judgment, to repeal the statute.
We have reserved one or two remarks, which seem to be applicable to all the transactions set forth in the answer of the defendants. Although merchandise, in a bonded warehouse, is declared, by the Acts of Congress, to be subject to the order of the importer, making the entry, yet, by the regulations of the Treasury, the importer can only exercise his power, so as to enable a third person to obtain possession of the merchandise, by an authority, in writing, to such person, to withdraw the goods, signed by himself, and indorsed upon a withdrawal entry; and the answer of the defendants contains no averment, that, with respect to any of the transactions, by which they claim to have acquired the possession of the bark belonging to the plaintiffs, any such withdrawal entry was made, or written authority given. It is true, that had these facts been alleged, and admitted to be true, they would not have amounted to a defence, against the claims of the plaintiffs, but they might, perhaps, with propriety, have been as that the defendants had *466 the constructive possession of .all the bark, that they allege to have been pledged to them.
From the views, that we have felt it our duty so fully to express, in the conviction that the provisions of this important statute, “ The Factors’ Act,” have been too generally misunderstood, and that practices wholly inconsistent with their just interpretation, have extensively prevailed, it is a necessary result, that we cannot hold, that the transactions relied upon by the defendants, all or any of them, are any evidence of a contract, rendered valid by the provisions of the statute, so as to entitle the defendants to that lien and power of disposition over the property of the plaintiffs, which they now assert. Not one of the transactions was founded upon the faith and transfer of any document of title, specified in the Act, or intrusted, by the plaintiffs, to their factor.
II. We have thus considered, with a degree of particularity, which the importance of the subject seemed to us to require, the construction of the third section of the Act in question, and have stated our reasons for holding, that the claim of the defendants, Hitchcock & Reading, to retain the plaintiff’s property, under the provisions of that section, cannot be sustained.
It is obvious, we think, that the fourth section of the Act can receive no construction more favorable to the views of those defendants.
It might, perhaps, be just to say, that where the attempt to pledge the goods is made to secure a then present advance, if it fail in the requisites to give it validity, under the third section, it must be altogether void,—void at the common law, and not within the provisions of the statute. The fourth section would not in terms, nor by any latitude of construction, embrace it. The transaction could not then be called a deposit as a security for an antecedent debt or demand; and if it cannot be sustained within the terms of either section of the statute, it is simply a transaction not covered by the statute, and which, by the common law is void, as a fraud upon the rights of the owners.
But it has been already observed, that it appears by the answer of the defendants, Hitchcock & Reading, that certain of the alleged advances were made, before the arrival of portions of the *467 bark which they claim to hold as security therefor, and were made, in reliance upon the promise of Mosquera & Go., subsequently performed, by the alleged transfer; and that if the transaction be valid at all, against the owners, it is so only under the fourth section of the statute, as a deposit to secure an antecedent debt. =
The provisions of the fourth section are, that “ Every person who shall hereafter accept or take any such merchandise in deposit from any such agent, as a security for any antecedent debt or demand, shall not acquire thereby, or enforce any right, or interest in or to such merchandise or document, other than was possessed, or might have been enforced by such agent at the time of such deposit.”
Under these provisions we observe, first, that there is a v.ery important distinction between a mere delegation to a depositary, of the right to receive the amount due to the factor, for which he has a lien upon the goods, and a deposit with a third person, as security for a debt due by the factor, which divests the factor of all control over the goods.
The first-named delegation, accompanied by a delivery of the possession of the goods, was held valid before the statute; but the transaction was carefully guarded by rules, designed' for the protection of the owner. In Urquhart v. McIver, ( 4 J. R. 103,) it was held, that although a factor could not pledge the goods of his principal, yet he might deliver them to a third person, with notice of his lien, in order to preserve that lien. The possession of the third person, in such case, was deemed a continuance of the factor’s possession. And the case of McCombie v. Davies (7 East. R. 5) sustained such a transfer, although the purpose of the transfer was to secure the depositary, for moneys due to him by the factor. A very important qualification of the right to transfer the possession for such a purpose is, that to sustain such a delegation of the factor’s lien to another, the third person must be under the authority of the factor, and the possession of the goods must be held for the purpose of securing and carrying out the object of the original consignment. (McFarland v. Wheeler, 26 Wend. R. 467.)
It is certain, we think, that this is not the deposit contemplated by the fourth section of the statute, and it requires no discus *468 sion to show, that the alleged transfer, to the defendants, is not of this description.
The statute was evidently designed to. give to the depositary such right or interest as the factor possessed, or might have enforced.
In providing, that the depositary should not acquire any other right or interest than was possessed by the agent, the implication is necessary that, to the extent of the right or interest possessed by the agent, the depositary shall become entitled, and to the extent of such right or interest, he is substituted for the agent. The latter is thereby displaced, his control of the goods is divested;—a new agent, in whose selection the owner has had no voice, in whose skill and judgment he has reposed no confidence, in whose integrity or fidelity he has in no wise trusted, has the control and disposition of the owner’s property.
This is an alteration of the common-law rule, and the claimants must show themselves strictly within the statute.
Have the defendants, Hitchcock & Reading, accepted or taken any of the bark in question in deposit ? The very terms of this section seem to us to require actual possession of the goods in the factor, and an actual transfer of that possession to the creditor; and if the introduction of the word “ document” into the latter clause of the section may be taken to give validity to a transfer of a document of title, then, plainly, that document must be transferred. And the conclusion is irresistible, that the same transfer of possession is necessary, when possession without documentary evidence of title is relied upon, and the documentary evidence óf title must be of the same description, when documents are relied upon, as is necessary, under the third section, to give validity to a transfer, for a present advance. And all the observations that we have made in relation to the nature of the documents required, and to the necessity of an actual transfer of the possession of the goods, are no less applicable to this, than to the third section of the statute.
Whether, under this fourth section, the depositary may acquire and enforce the right or interest which was possessed by the factor, notwithstanding he has notice of the owner’s title, it is not material to consider.
There are some further reasons, which would constrain us to say, that the injunction in this cause ought not to be dissolved—reasons *469 which should influence our determination of this appeal, if we deemed it doubtful whether the defendants, Hitchcock & Reading, could or could not be subrogated to the rights and remedies of Mosquera & Co., as against these plaintiffs. Upon which question, however, we think it proper to observe, that we consider it settled, that where a pledge was made by the factor which could not be sustained, as against his principal, it not only failed to invest the pledgee with any title, but it operated as a forfeiture of the factor’s lien. As against the owner, the lien was gone forever. See the cases above referred to, and among them Fielding v. Kymer, (2 Brod. & Bing. R. 639,) is a striking example of the rigor with which this rule was enforced.
It is true that the plaintiffs, by their bill of complaint, offer to pay the amount which shall, upon a just accounting, be found due from them to Mosquera & Co. Notwithstanding the suggestion of their counsel, that such offer was made in ignorance of the extent and character of the lien claimed, by Hitchcock & Reading, it appears by the complaint itself, that they were aware that Hitchcock & Reading claimed a lien upon, or title to the bark, for advances made to Mosquera & Co.; and they, nevertheless, avow their readiness to pay to Tracy, assignee of Mosquera & Co., or to Hitchcock & Reading, (whichsoever may be entitled,) the balance due by them.
But if the cases, above referred to, shall govern the ultimate decision of this case, and the pledge be declared wholly illegal and void, then Tracy, the assignee of the insolvent debtors, Mosquera & Co., and not Hitchcock & Reading, will be entitled to the moneys due from the plaintiffs, and it will be a grave question, whether, (although such assignee does not set up that claim in his answer,) the Court may not feel bound to regard the interests of the creditors for whom Tracy is a trustee, and whose interests, if this view of his rights should prevail, he is bound to assert and maintain.
Be this as it may, having arrived at the conclusion, that the transfer to the defendants, Hitchcock & Reading, is not valid as a pledge, we cannot refuse to enjoin the latter against a sale of the goods, unless we are prepared to assert two propositions, to which, in this stage of the litigation, at least, we are not prepared to assent: First, That although the transfer, to the defendants, Hitchcock & Reading, cannot operate as a pledge of the goods, it *470 may, by equitable construction, have effect as a transfer of the debt due by the plaintiffs; and, second, That, notwithstanding the attempted illegal transfer of the plaintiff’s merchandise, the lien thereon-still continues, as a security for the moneys advanced thereon by the factors. The latter of these propositions is, as we believe, in contravention of principles well settled, prior to the statute, and, unless the claimant is within the provisions of the statute itself, we do not perceive that his position is thereby altered or improved. And, as to the first, we may say, (without designing to do more than express a doubt on the subject,) that where the attempt, in fact made, is to make an illegal transfer of the plaintiff’s property, in actual fraud of his rights, it is not clear that any notion of equity calls upon us to sustain it for any purpose. And if, upon a final consideration of this case, the Court should feel called upon, under the pleadings herein, or otherwise, to hold the defendants, Hitchcock & Reading, entitled, by constructive transfer, to the sum due from the plaintiffs, and to require the payment of that sum, according to the offer in the complaint, it would by no means follow that the defendants, Hitchcock & Reading, should be-permitted to go on and sell the merchandise, in their discretion. The plaintiffs have a right to require that, if this view of the rights of the partiesbe taken, they be permitted to redeem the property, according to the prayer of their complaint, and, in that mode, obtain the control of the property, for disposition, in the manner, and at the time most agreeable to their own view of their interests.
The order appealed from must be reversed, and an injunction be granted, according to the prayer of the complaint.*
Ordered accordingly.

 6 Geo. IV, c. 94, Section 2d.—“ And be it further enacted, That, from and after the first day of October, one thousand eight hundred and twenty-six, any person or persons intrusted with and in possession of any bill of lading, India warrant, dock warrant, warehouse-keeper’s certificate, wharfinger’s certificate, warrant, or order for delivery of goods, shall be deemed and taken to be the true owner or owners of the goods, wares, and merchandise described and mentioned in the said several documents hereinbefore stated respectively, or either of them, so far as to give validity to any contract or agreement thereafter to be made or entered into by such person or persons so intrusted, and in possession as aforesaid, with any person or persons, body, or bodies politic or corporate, for the sale or disposition of the said goods, wares and merchandise, or any part thereof, or for the deposit or pledge thereof, or any part thereof, as a security for any money or negotiable instrument or instruments advanced or given by such person or persons, body, or bodies politic or corporate, upon the faith of such several documents, or either of them; provided such person or persons, body, or bodies politic or corporate, shall not have notice by such documents, or either of them, or otherwise, that such person or persons so intrusted as aforesaid, is or are not the actual and bona fide owner or owners, proprietor or proprietors, of such goods, wares, or merchandise so sold or deposited or pledged as aforesaid; any law, usage, or custom to the contrary thereof in anywise notwithstanding.”

 The judgment of the Court, in this case, was announced by Mr. Justice Woodruff, who stated, as the reasons of the Court, the views contained in the opinion of Chief-Justice Duer, in which views the other Judges, who heard the argument, substantially concurred. Chief-Justice Duer did not sit in Court after the 9th of January, 1868, the day of the casualty, (6 Duer, ix.,) from the effects of which he never fully recovered, although he subsequently wrote several opinions of much interest, and with his usual vigor and ability, in causes previously argued at General Terms, held by himself and other Justices of the Court.
The importance of the questions involved in this case, and the ability with which they-are discussed, are such, that no apology is deemed necessary for devoting to them .the space they occupy.—Ref.